Joseph S. LEWIS, Appellant,

v.

UNITED STATES, Appellee.

No. 86–1266.

District of Columbia Court of Appeals.

Argued Feb. 16, 1988.

Decided April 28, 1988.

Syrie Davis, Public Defender Service, with whom James Klein and Maureen T. Cannon, Public Defender Service, Washington, D.C., were on the brief, for appellant.

Elizabeth H. Danello, Asst. U.S. Atty., with whom Joseph diGenova, U.S. Atty., at the time the briefs were filed, and Michael Farrell and Debra Long–Doyle, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MACK, FERREN and ROGERS, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant on one count of assault with a dangerous weapon, D.C. Code § 22–502 (1981). He now appeals, citing numerous instances of prosecutorial misconduct in the trial of his case. We agree that the cumulative effect of the prosecutor's misconduct rises to the level of plain error. We therefore reverse appellant's conviction and remand for a new trial.

### I.

The government's evidence shows that the victim, William Davis,[1] visited with appellant on the day of the assault at the apartment appellant shared with the victim's sister, Michelle Davis. William Davis had encountered appellant and his sister on the street and returned with them to their apartment. There, William Davis smoked a PCP-laced marijuana cigarette and talked with Michelle Davis. Appellant then struck up a conversation with William Davis while Michelle Davis straightened up the house. Michelle Davis testified that she did not listen to the conversation between appellant and her brother, although at one point she observed her brother waving his open hand in appellant's face. Michelle Davis then heard a gunshot and saw her brother doubled over, holding his stom-

---

1. The victim died before trial of causes unrelated to the assault charged in this case. Therefore, no testimony by the victim himself was presented.

ach. William Davis said he had been shot and ran from the apartment.

William Davis ran to the house of a friend, Barbara Fowkes, where he, Fowkes, Theodore Harrington, and Brenda Johnson had been celebrating Harrington's birthday earlier in the day. William Davis exclaimed "Joe shot me" and showed Harrington a bullet hole just below his navel. Fowkes, Harrington, and Johnson then took the victim to the hospital, where he was treated for a bullet wound to the stomach. The treating physician noted no other injuries.

At the hospital, before the bullet was removed, William Davis told Officer Angelo Hicks that he had been shot on the corner of 6th Street and Florida Avenue by a six-foot tall assailant with whom he had quarreled over money. (The treating physician testified that William Davis had given him a similar explanation for his wound.) Hicks stated on cross-examination, however, that the victim had told him several differing versions of what had happened. In rebuttal, moreover, Theodore Harrington testified that William Davis had told him he intended to fabricate a robbery story for the police and to take revenge himself on the person who had shot him. Harrington had advised him not to seek his own revenge but to let "the system" handle the matter.

Nineteen days after the crime, police searched the apartment appellant shared with Michelle Davis and found a .32 caliber handgun hidden beneath the cushions on the sofa. Although no fingerprints were recovered from the gun, ballistics evidence presented at trial revealed that the bullet recovered from the victim's stomach had been fired from the gun the police found.

## II.

■ Appellant contends that the prosecutor, in closing and rebuttal arguments, misstated the testimony of the witnesses and argued facts not in evidence. Because there was no objection to the prosecutor's remarks, appellant concedes we may reverse only for plain error, *Jones v. United States*, 512 A.2d 253 (D.C.1986), that is, error so prejudicial as to have compromised "the very fairness and integrity of the defendant's trial." *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc). We are persuaded that several of the instances of misconduct cited by appellant, taken together, rise to that level. In particular, we note three instances in which the prosecutor's argument was both improper and significantly prejudicial to appellant's case.

First, in rebuttal closing argument, the prosecutor—perhaps in an attempt to bolster Michelle Davis' testimony after defense counsel had argued in closing that she lacked credibility [2]—stated:

> Maybe Michelle Davis didn't tell us everything that happened that day in the, in that apartment. Maybe she saw more things than what she told us. But one thing that she did tell us, *she told us that she didn't want to tell us that she saw Joseph Lewis with the gun.*

(Emphasis added.) The prosecutor's rebuttal argument that Michelle Davis "told us that she didn't want to tell us that she saw Joseph Lewis with the gun" clearly implied that Michelle Davis did in fact see Joseph Lewis with the gun but had declined to testify truthfully in that regard.[3] Nothing in the record, however, indicates that Davis ever had seen the gun. To the contrary,

---

2. Even the prosecutor conceded that Michelle Davis "was not the most alert witness" and had had trouble walking from the witness stand to an easel displaying a diagram of her apartment.

3. The government asks us to read the prosecutor's words literally, and submits that "the reference to the gun was part of the prosecutor's discussion not of what Davis said, but of what she did not want to say." Although the government concedes that the prosecutor's statement is subject to the interpretation we give it here, the government nonetheless urges us to give the

statement an alternate construction. The government suggests that the jury could just as reasonably have inferred from the prosecutor's remark that "[Michelle Davis] had not seen a gun and was relieved not to have to tell the jury that she had." We disagree. It strains the imagination to think the prosecutor intended to tell the jury that the government's star witness had not seen appellant with the gun, and it is equally difficult to imagine that the jury interpreted her remark in that way.

Davis, on cross-examination, specifically testified that she had never seen the gun in appellant's hands.[4] We conclude, therefore, that the prosecutor's argument constituted a clear misstatement of the evidence and, as such, was misconduct. *See Jones*, 512 A.2d at 258; *Logan v. United States*, 489 A.2d 485, 489 (D.C.1985); *Bowler v. United States*, 480 A.2d 678, 686 (D.C. 1984).

Second, the prosecutor engaged in misconduct when she suggested, in closing argument, that Theodore Harrington knew the "Joe" to whom the victim had referred on the night of the crime was appellant, Joseph Lewis. Specifically, the prosecutor argued:

> [William Davis] walked into the house and the first thing he said was Joe shot me.
>
> And ladies and gentlemen, who is Joe? Coincidentally, *Joseph Lewis, that happens to be his name.* He [William Davis] said that Joe shot him, *a person who was known to Theodore Harrington.*

(Emphasis added.) In other words, the prosecutor suggested to the jury that, because Harrington knew Joseph Lewis—and, inferentially, because William Davis knew Harrington knew Lewis—William Davis' statement that "Joe shot me" should be clearly understood to have referred to Joseph Lewis. Otherwise, Davis would not have referred merely to "Joe"; *i.e.*, the reference to "Joe" would have been meaningless.

The problem is, however, that there was no record basis for suggesting that Harrington either knew Joseph Lewis or knew that Davis was referring to Joseph Lewis. In the first place, although the prosecutor

established at trial that Harrington had "met" appellant Lewis, she did not establish whether they had met before or after the shooting. In any event, to meet someone is not necessarily to know that person.

Furthermore, there is no evidence of record from which the jury might reasonably have inferred that Theodore Harrington must have known William Davis was referring to Joseph Lewis when he said "Joe." Indeed, when the prosecutor had asked Theodore Harrington on direct examination, "Do you know which Joe [William Davis] was talking about when he said Joe [shot me]?" the trial court sustained defense counsel's objection. Harrington never answered the prosecutor's question. There is nothing in the record to indicate that Harrington had any reason to believe that William Davis had meant Joseph Lewis. At most, therefore, one might reasonably infer from the record that Davis' statement to Harrington, "Joe shot me," referred to someone Harrington knew; but the prosecutor's remarks were both "misleading and unreasonable," *Bowler*, 480 A.2d at 686, since her argument implied facts not in evidence and testimony not in the record. Her remarks, therefore, were clearly improper. *See Logan*, 489 A.2d at 489.

Finally, the prosecutor improperly argued that the police had "resolve[d]" the case when they had investigated the facts and taken appellant into custody. This argument implied that the police had already conclusively determined appellant's guilt, as reflected in their decision to arrest him. The prosecutor argued:

> [W]e know that [William Davis] did not take revenge out on Joseph Lewis. That did not happen. *We're here today be-*

---

4. On cross-examination, defense counsel elicited from Michelle Davis the following answers:

   Q. Now, while you were in [the apartment], *you never saw Joseph Lewis with a gun, did you?*
   A. *No.*
   Q. And you never saw Joseph pull out a gun and aim it at William, did you?
   A. No.
   Q. You never heard Joseph say anything like I'm going to shoot you or I'm going to kill you, did you?

A. No.
* * * * * *
Q. Okay. And what you heard was a pop or like a shot, is that right?
A. Yes.
Q. *But never saw anything?*
A. *No.*
(Emphasis added.) Davis' answers, although brief, are unequivocal. Nowhere in her testimony did she indicate that she had in fact seen appellant with the gun but did not want to tell the jury so.

*cause the police did resolve this matter,* because the police did gather up evidence, *and because the police did arrest Joseph Lewis.*

(Emphasis added.) Although the mere mention of appellant's arrest, without more, would not constitute misconduct, the prosecutor here, in effect, suggested that the jury should assume from the fact of appellant's arrest that he was guilty. Every defendant, however, must be afforded the presumption of innocence until proved guilty at trial. *See Commonwealth v. Smihal,* 182 Pa.Super. 232, 238, 126 A.2d 523, 525 (1956) ("The presumption of innocence ... is not overcome by the fact that a defendant has been arrested and indicted."); *Lundberg v. Baumgartner,* 5 Wash. 2d 619, 623, 106 P.2d 566, 568 (1940) (arrest not competent evidence of wrongdoing). Moreover, the government has the burden to prove each element of the crime charged beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) The prosecutor's suggestion that the police had "resolve[d]" the case, therefore, was seriously misleading and, thus, inappropriate.

### III.

■ Having concluded that the prosecutor's remarks constituted misconduct,[5] we must ascertain whether the misconduct was sufficiently prejudicial to require reversal. *See Watts,* 362 A.2d at 709. To do so, we consider:

> the gravity of the misconduct, [the] direct relationship [of the misconduct] to the issue of guilt, the effect of specific corrective instructions by the trial court,

and the strength of the government's case.

*Hammill v. United States,* 498 A.2d 551, 554 (D.C.1985) (citations omitted). Here, the cited misconduct was serious; the first two instances reflect an effort to argue facts that clearly were not in evidence, and the third, while perhaps less egregious, suggested that the fact of the arrest itself conclusively demonstrated guilt.

Furthermore, no contemporaneous curative instructions were given.[6] On the other hand, defense counsel did not object to the prosecutor's remarks. In its charge to the jury, moreover, the court did give the usual instruction that "if a lawyer has made a reference to the evidence which is inconsistent with your memory, it is your memory and not the lawyer's which controls." Thus, the absence of specific corrective instructions does not help appellant very much.

The remaining two factors, however, cut very much in appellant's favor on this record. The prosecutor's misconduct related directly to the issue of appellant's guilt and bolstered what was otherwise a relatively weak and wholly circumstantial government case.

More specifically, there was no direct evidence of appellant's guilt. No one saw the shooting, no fingerprints were recovered from the gun, and the victim himself gave conflicting stories about how he was wounded. The strongest evidence against appellant was Michelle Davis' testimony that appellant and her brother were in the apartment together talking at the time her brother was shot,[7] coupled with the testi-

---

5. We need not reach appellant's argument that the prosecutor impermissibly commented in her closing argument on appellant's failure to testify, since we find adequate basis for reversal on other grounds. We cannot reach appellant's argument that the prosecutor mischaracterized defense counsel's opening statement because the opening statement for the defense was not included as a part of the record on appeal.

6. We do not decide whether such curative instructions would have made a difference in the result here. We note, however, that the trial court is free *sua sponte* to take such corrective action when the prosecutor, in closing or rebuttal argument, misstates the evidence. *See Haw-*

*thorne v. United States,* 476 A.2d 164, 169 (D.C. 1984).

7. The prosecutor had good reason to want to restate Michelle Davis' testimony in a more compelling form. The trial judge, outside the presence of the jury during argument on appellant's motion for judgment of acquittal, asked rhetorically whether the prosecutor thought Michelle Davis "saw anything that night," and noted that Davis "may have been [there] in body alone, [but] I don't think her mind was there." The trial judge highlighted Davis' questionable credibility when he referred to Davis as "[the government's] star eye witness with the PCP distribution convictions," and questioned "Why

mony that the victim said "Joe shot me" shortly after he had been wounded. Thus, the government's case was not strong.

The prosecutor's improper remarks each served substantially to buttress the government's otherwise less-than-compelling case. Her assertions that Michelle Davis "told us she didn't want to tell us she saw [appellant] with the gun" and that the "Joe" the victim referred to was appellant Joseph Lewis, someone "known to Theodore Harrington," implied facts not in evidence that directly implicated appellant and thus significantly enhanced the strength of the government's case. The prosecutor's embellishment was compounded by her assertion that the police had "resolve[d]" the case when they arrested appellant, implying the case was open-and-shut.

Finally, we must take into account that, because the prosecutor made two of her improper statements in rebuttal closing argument, appellant had no opportunity to respond to those remarks. *Powell v. United States,* 455 A.2d 405, 411 (D.C.1982), *reh'g denied,* 458 A.2d 412 (1983) (prejudicial effect of misconduct was compounded by timing of remarks in rebuttal argument). We conclude, therefore, that given the gravity of the misconduct, its direct relationship to the issue of guilt, and the circumstantial nature of the government's case, the prosecutor's misconduct jeopardized "the very fairness and integrity of the trial." *Arnold v. United States,* 467 A.2d 136, 137–38 (D.C.1983) (citing *Watts,* 362 A.2d 706).

*Reversed and remanded.*

should I credit her testimony at all?" The sobriety of the witness had been questioned at the start of the trial, although she was determined competent to testify.