Elton CARPENTER, Tyrone
Smallwood, Appellants,

v.

UNITED STATES, Appellee.

Nos. 91–CF–932, 91–CF–1321.

District of Columbia Court of Appeals.

Argued Oct. 18, 1993.
Decided Dec. 29, 1993.

Richard Greenlee, Public Defender Service, with whom James Klein and Jo-Ann Wallace, Public Defender Service, Washington, DC, were on the brief, for appellant Elton Carpenter.

W. Gary Kohlman, Washington, DC, and Peter N. Mann, Ashton, MD, for appellant Tyrone Smallwood.

Steven D. Mellin, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Atty., at time brief was filed, John R. Fisher, Thomas C. Black, and Mark J. Carroll, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FERREN, STEADMAN, and WAGNER, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant Carpenter of assault with a dangerous weapon, D.C.Code § 22–502 (1989), and appellant Smallwood of voluntary manslaughter while armed, D.C.Code § 22–2405 (1989). Judge Ryan sentenced Carpenter to prison for two to six years and Smallwood to life imprisonment under the Youth Rehabilitation Act, D.C.Code § 24–803 (1989). Both appellants challenge their convictions on two grounds: (1) the trial court should not have admitted testimony, over objection, which the government elicited on redirect examination from one of its key witnesses, Chevelle Jackson, to explain her fear of testifying, since that testimony strongly implied—without any evidentiary foundation—that appellants, through family members, were responsible for beating up Jackson a few weeks before trial; and (2) the prosecutor improperly commented during closing argument to the jury on this unfounded linkage between appellants and Jackson's beating, and also improperly incited the jurors' passions by urging convictions in order to help make the neighborhood safe for witness Jackson. We agree with these contentions and thus reverse and remand for a new trial.[1]

---

1. We therefore need not reach appellants' individual claims of error. Specifically, Carpenter contends that the government elicited inadmissible hearsay from another key witness, Taunya Sutherland, when it improperly refreshed her recollection, and that the government should not have been allowed to introduce Carpenter's written statement to the police because the prosecutor had violated Super.Ct.Crim.R. 16(a)(1)(A) by failing to produce the statement to defense counsel until the day before trial. Smallwood challenges his sentence on the ground that the trial court was under the mistaken impression that the Youth Rehabilitation Act mandated a life sentence.

## I.

On November 10, 1988, Carl Cooper was killed. At appellants' trial, the government presented evidence that Carpenter had assaulted Cooper with a stick and Smallwood had stabbed him twice with a knife. The government's evidence established that the attack apparently occurred as a result of Cooper's sale of a defective telephone to Carpenter a month earlier. Both appellants presented evidence that they were not present at the scene of the crime.

The government relied primarily on the testimony of three eyewitnesses. The first, Chevelle Jackson, testified against both appellants. Jackson testified that she had known Carpenter and Smallwood for a number of years from the neighborhood where she grew up and her mother presently lived. On November 10, 1988, Jackson was on her way to her mother's house when she saw Carpenter and Smallwood talking to Carl Cooper. Jackson continued to walk away, noticing that the three men had begun to fight. Jackson saw Carpenter swinging a stick at Cooper. She also observed both appellants hitting Cooper. Before Jackson went into her mother's house, she saw Smallwood holding a bloody knife and heard him telling another man that he had stabbed Carl Cooper in the chest. Several months later, on March 22, 1989, Jackson spoke with Detective James Johnson about the incident and identified both Carpenter and Smallwood in photographs as the men she had seen attacking Carl Cooper. Jackson testified that after the incident, she did not tell anyone what she had seen because she was afraid.

K.B. was the government's second eyewitness to the attack. K.B. testified that he had been on his way to the store with some friends when he saw a man on the ground and Carpenter standing nearby with a stick. That stick was long, with a big tip, and was covered with blood. K.B., a minor, testified that he did not see Smallwood at the scene of the crime. K.B. nevertheless identified both

appellants Carpenter and Smallwood in court.

The government's third eyewitness was Taunya Sutherland, who testified only against Carpenter. Sutherland testified that as she came out of a store, she saw Carl Cooper lying on the ground. When the prosecutor asked whether she had seen Carpenter at the scene, Sutherland said she did not remember. The prosecutor then gave Sutherland a copy of the statement she had made to Detective James Johnson and asked her to use it to refresh her recollection. Sutherland then acknowledged that she had told Detective Johnson she had seen Carpenter "out there the day Carl Cooper was killed."[2]

The government called James Cooper, the decedent's brother, to establish appellants' motive for the attack. He testified that about one month before the stabbing, his brother had sold Carpenter a phone for $20. He further testified that three days before the attack, Carpenter had told him, "[W]hen you see your brother tell him that I want my money for the phone or I'm going to F him up."[3]

## II.

A. *Cross and Redirect Examination of Chevelle Jackson*

### A.

On cross-examination, counsel for both appellants questioned Chevelle Jackson repeatedly as to why she had waited so long to talk to the police about the attack on Carl Cooper and why she had never told anyone that she had witnessed the attack. Jackson replied that she had not spoken to the police about the incident for almost five months because she had been afraid. She first told the police about the incident on March 22, 1989, when the police came to speak to her about her boyfriend, Jeffrey Edelin. Jackson also testified that, before trial, she had never told her best friend, her mother, or her

---

2. Carpenter claims the prosecutor improperly refreshed Sutherland's recollection, an issue we need not reach. See *supra* note 1.

3. Detective Dwayne Stanton also testified for the government that he and Detective Herman John-

son had taken Carpenter's statement on November 10, 1988. Again, in light of our disposition, we need not address Carpenter's contention that the trial court erred in admitting this statement in evidence. See *supra* note 1.

boyfriend that she had witnessed the attack. Soon after the incident, in fact, Jeffrey Edelin told Jackson that Carl Cooper had been killed, but Jackson did not tell Edelin that she had been an eyewitness. She feared that if Edelin told anybody she had seen what happened, someone would hurt her. Jackson further testified that she had been afraid of Smallwood, in particular, because she worried that someone might tell him she had witnessed the attack.

Defense counsel also questioned Jackson about her inconsistent statements regarding the number of times she had seen Carpenter hit Cooper and about the information she had provided to defense investigators.[4] Jackson answered that her inconsistencies were attributable to being forced to testify against her will.[5]

## B.

On redirect examination, the government attempted to elicit further testimony from Jackson to explain her inconsistent statements, as well as the reasons for the fears which had prevented her from telling anyone she had witnessed the attack. She explained that she had been afraid because the neighborhood in which the attack took place was a "high crime" neighborhood in which "people kill [snitches]." The prosecutor then asked Jackson what happened after the lineup when she identified Smallwood. Before Jackson responded, counsel for Smallwood asked for a bench conference. Counsel objected to the prosecutor's questions about the events that took place after the lineup, claiming that they went beyond the scope of cross-examination. Specifically, counsel was seeking to keep out of the trial all irrelevant evidence that purported to explain Jackson's fear. Counsel was not concerned about legitimate reference to Carpenter's fears during the limited period of time before she finally cooperated with the police by giving a statement and attending a lineup; rather, counsel was seeking to keep out evidence of later, allegedly irrelevant references to threats by Smallwood's family that could not possibly have a bearing on why Jackson had been afraid to help the police.[6] The court overruled counsel's objection and decided to allow

---

**4.** Defense counsel read Jackson's grand jury testimony to the jury, showing that Jackson had testified there that she had seen Carpenter hit Cooper with the stick four to five times. At trial, however, Jackson testified that she had seen Carpenter hit Cooper only once.

Defense counsel also questioned Jackson about the statement she had made to investigators from the Public Defender Service on January 29, 1991. Jackson had told the investigators, and had given a written statement, that she had not witnessed the attack on Carl Cooper. Jackson testified at trial, however, that she had lied to the investigators because "she didn't want to talk to them" and because she believed she "didn't have to tell them the truth" since she wasn't under oath. She also stated that she had thought she wasn't "supposed to talk about it until we went to court."

**5.** Jackson responded as follows to defense counsel's questions about her unwillingness to testify:

Because I don't want to be here and I'm forced to be here. Because I don't—I don't want to talk about this, but y'all are forcing me to be here and talk about this.

**6.** [COUNSEL FOR SMALLWOOD]: Your Honor, [the prosecutor is] intending to get into an area where allegedly threats were made by my client's family. And, out of respect to this witness, I was very, very careful in my cross examination that I didn't ask her or opine that

she was—had any reason to be afraid after she gave the statement.

I—I limited my questions about fear that she might have to the period of time before she gave the statement. I did so purposely because I don't want this information coming in.

So, I think it's beyond the scope of cross examination and not proper for redirect. Especially given the prejudicial nature of—of the information.

[PROSECUTOR]: [Counsel for Smallwood] opened the door on this the Government submits, when he wanted to know when she started becoming afraid and why she was afraid.

It's relevant to this case. It can be substantiated with her testimony. It reflects on her state of mind as to her testimony at the time and her testimony in court today why she's afraid.

\*   \*   \*   \*   \*   \*

THE COURT: I think, also [Carpenter's counsel's] cross examination opened up this issue.

\*   \*   \*   \*   \*   \*

[PROSECUTOR]: That the government does not intend to say that Tyrone Smallwood, nor Elton Carpenter intimidated her in any manner, or threatened her in any manner.

\*   \*   \*   \*   \*   \*

THE COURT: You have your position on the record, but I do think it's been opened up. I think he has a right to go into it.

the prosecutor to continue his line of questioning.

Jackson then testified that when she came out of the lineup room, the defense attorney pointed her out to Smallwood's family, telling them that she had identified Smallwood in the lineup. According to Jackson, this was when her problems began. Shortly after the lineup, Smallwood had a conversation with Jackson's brother, and Smallwood's mother and sister made trips to Jackson's mother's house on two separate occasions. On the first occasion, they both spoke with Jackson's mother about the lineup; on the second occasion, Smallwood's sister told Jackson that she did not "know why they call[ed] [Jackson] down there and ask[ed] [her] those questions about [her brother] because [he] didn't do it." The prosecutor then asked Jackson about an incident that occurred on March 22, 1991, well over two years after Cooper had been killed. Jackson testified that a group of people whom she did not know had assaulted her on that day.

### C.

Appellants contend that the trial court should not have admitted two portions of Jackson's testimony: her statements about snitches being killed in the neighborhood and her references to the March 22, 1991 assault on her. They argue that, although cross-examination may have opened the door to further testimony on redirect explaining why Jackson had been reluctant to get involved in the case, testimony regarding these two particular matters was irrelevant and highly prejudicial. Appellants stress, more specifically, that Jackson's redirect examination had the prejudicial effect of linking appellants to the assault on Jackson, which occurred 28 months after Cooper was killed, and only six weeks before trial—even though there was no evidentiary basis for believing the Smallwoods had anything to do with the assault.

■ The scope of redirect examination rests within the sound discretion of the trial court and will not be reversed absent a clear showing of abuse. *See Hairston v. United States,* 497 A.2d 1097, 1103 (D.C.1985). Jackson's testimony on cross-examination that she had been afraid to get involved in the case opened the door for the prosecutor to explore on redirect her explanations of why she was afraid. *See Lampkins v. United States,* 515 A.2d 428, 430 (D.C.1986) (court did not abuse its discretion in admitting certain rebuttal testimony once defense counsel opened door to particular line of inquiry); *Hairston,* 497 A.2d at 1103 (court did not abuse its discretion in allowing prosecutor on redirect to clarify possible misleading impression from defense inquiry).

■ The prosecutor's redirect examination of Chevelle Jackson began with questions about snitches in the neighborhood, then— over objection, see *supra* note 6—addressed the incident after the lineup, as well as the confrontations between Jackson and Smallwood's family, and, finally, elicited testimony about the assault on Jackson months later.[7]

7. Redirect occurred as follows:

Q Would you characterize that neighborhood as a "high crime" neighborhood?
A Yes.
Q What happens to snitches in your neighborhood?
A People kill them.
Q Did you have that fear?
A Yes.
Q When you went down to the line-up, did you tell anyone in the neighborhood or the family *that you were going down to the line-up?*
A No.
Q Once you were down at the line-up and you identified Mr. Smallwood in the line-up, what happened when you came outside the door?

[objection and bench conference, see *supra* note 6]
  *   *   *   *   *   *
Q When you went down to the line-up that day and you came outside, what did the defense attorney do?
A The defense attorney went out, he saw me and he told the family that I pointed him out in a line-up.
Q So—so, he identified you to people outside in the waiting room as having picked Tyrone Smallwood out in the line-up?
A Yes.
  *   *   *   *   *   *
Q Was that when your problems started?
A Yes.
  *   *   *   *   *   *
Q Did Mr. Smallwood's mother or sister come back to your house, again?

Jackson's testimony, on redirect, about what happens to snitches in the neighborhood, as well as about the confrontations with Smallwood's family, provided explanations corroborating her fears, including her earlier expressed fear of Smallwood, which had prevented her from going to speak to the police. Jackson's testimony about confrontations with Smallwood's family, however, also had the effect of providing a specious link between Smallwood and the subsequent assault on Jackson. While her testimony about the snitches and the confrontations with Smallwood's family, therefore, was relevant and admissible for the limited purpose of explaining the fears that had kept Jackson away from the police, Jackson's testimony about Smallwood's family became highly prejudicial once the trial court allowed testimony about the assault.[8]

Jackson's testimony about the March 22, 1991, assault exceeded the bounds of proper redirect examination. At the time, the trial court overruled defense counsel's objection to questions about events after Jackson had identified Smallwood at the lineup, the prosecutor informed the court at a bench conference that the government did not intend to suggest that either Smallwood or Carpenter had intimidated or threatened Jackson. See *supra* note 6. However, this was in fact the precise effect produced by the cross-examination involving the assault.

In sum, the chronology of Jackson's testimony on redirect after the trial court denied defense counsel's bench conference objection, see *supra* note 7, very likely led the jury to associate appellants or their families with the assault on Jackson—even though there was no evidence whatsoever linking appellants or their families to that assault. The improperly admitted assault testimony, therefore, combined with the other testimony on redirect to result in evidence that was highly prejudicial to appellants. *See Jefferson v. United States,* 463 A.2d 681, 685 (D.C.1983) (in prosecution for felony murder and armed robbery, admission of evidence of subsequent, unrelated assault was error, requiring reversal, where assault charge had been severed from the other charges); *cf. Carter v. United States,* 614 A.2d 913, 918–19 (D.C. 1992) (prosecution's questions to defense witness concerning possible intimidation of witness by appellant may have been improper but did not require reversal because testimony did not actually state or imply that *appellant* was involved in intimidation). The trial court, therefore, abused its discretion in admitting the assault testimony.

B. *The Prosecutor's Closing Argument*

In his closing argument to the jury, the prosecutor repeatedly referred to Chevelle Jackson's testimony on redirect examination. More specifically, he referred to her testimony that people kill snitches in the neighborhood and that Jackson had been assaulted six weeks before trial. In addition, the prosecutor's last statement to the jury, in his rebuttal closing argument, was a request for the jury to· convict appellants so that Chevelle Jackson could go home and not "be afraid any more."

Defense counsel did not object during the prosecutor's closing argument. The trial judge had an announced policy forbidding counsel to interrupt one another during closing arguments, thereby precluding immedi-

---

[COUNSEL FOR CARPENTER]: Again, Your Honor, it's leading.
THE WITNESS: Another time his sister came there while I was there and talked to me.

\*　　\*　　\*　　\*　　\*　　\*

THE WITNESS: She was talking to me. She came to me one time when I was standing at the gate with Jeffrey and she said, I don't know what's going on, but—then the detective called you downtown and he's trying to set you up. She said that I don't know why they call you down there and ask you those questions about my brother because my brother didn't do it.
Q　Ms. Jackson, as a result of these incidents, were you afraid to testify?

A　Yes.
Q　Okay. What happened to you on March 22nd, of this year?
A　Some people jumped me. I don't know who they were. I was walking down the street and they was in a car and they got out of the car and they acted like they were smoking some cigarettes. And I was with a little friend of mine and as we walked pass, they just jumped on me and started hitting me with the sticks.

8. Smallwood's counsel had objected to all redirect examination of Jackson concerning events after her lineup identifications. See *supra* notes 6 and 7.

ate objection to improper comment. After the judge instructed the jury, however, defense counsel moved for a mistrial, which the judge denied.

Appellants contend that, because the prosecutor made inappropriate closing arguments intending to inflame the jury's passions, his actions amounted to prosecutorial misconduct, resulting in substantial prejudice to appellants. We agree.

The prosecutor argued in closing that Jackson began receiving threats after Smallwood's counsel had pointed her out to Smallwood's family at the lineup. The prosecutor directly followed this reference to the lineup incident with a reference to Jackson's testimony that she had been threatened and beaten:

> That's when her threats started. That's when she had to go back to her own neighborhood where people now know that she was the one that testified, where people now know that she was the one who went to a lineup. Her testimony reflects that she was beaten up, that she had been threatened on several occasions.[9]

In rebuttal closing argument, the prosecutor again referred to the assault on Jackson, once more linking the assault to the incident after the lineup when defense counsel had pointed Jackson out to Smallwood's family:

> When asked on the stand, "When were you beaten up?" she was beaten up on March 22nd of this year. "Did you report it to the police?" "Yes, I did." "About what time were you beaten up?" "The last time I was scheduled to come down to court." She had a reason to be afraid.
> You saw on the tape—that was Jensen Barber, the attorney on the tape there.

Once she came outside and Jensen Barber told the family who it was that I.D.'d her son, her problems started. Did she have a reasonable fear to be afraid? Yes, she did.

Finally, appellants contend that the prosecutor's last statement to the jury represents a clear example of an inappropriate, inflammatory comment:

> Chevelle Jackson is going home today. Don't make her afraid any more. Convict.

■ Defense counsel's mistrial motion after closing arguments cited the prosecutor's final comment in rebuttal.[10] We believe that, in light of the trial judge's policy forbidding objections during the course of closing argument, this motion and supporting reason are enough to allow consideration of the other directly related improprieties in the prosecutor's closing, especially because of the earlier—soundly based—objections to inappropriate redirect examination about the March 22, 1991, assault on Jackson which the prosecutor improperly exploited in his summations. *See Hammill v. United States,* 498 A.2d 551, 554–55 (D.C.1985) ("The same degree of specificity in noting an objection hardly seems necessary when counsel is precluded from making a contemporaneous objection and the error is clear"); *Hawthorne v. United States,* 476 A.2d 164, 170 (D.C.1984) (appellant's motion for mistrial at end of prosecutor's initial closing argument preserved error for review on standard less stringent than plain error); *see also Mathis v. United States,* 513 A.2d 1344, 1347 & n. 8 (D.C.1986).

■ In evaluating the prosecutor's comments, we must first determine whether they constituted misconduct. *See Hammill,* 498 A.2d at 554. If misconduct has occurred, we must then view the comments in context to

---

9. The prosecutor's comment that Jackson had to return to "her own neighborhood," implying she lived in the neighborhood where the attack occurred, was inaccurate; the uncontradicted evidence showed that although Jackson's mother lived in that neighborhood, Jackson herself no longer lived there.

10. After the judge had instructed the jury, counsel for both defendants moved for a mistrial based on the prosecutor's closing argument:

[COUNSEL FOR CARPENTER]: But, I am going to ask for a mistrial now based on [the

prosecutor's] last remark to the jury which was, as I remember, "Don't make [C]hevelle Jackson afraid any more. Convict these people." I think that is completely improper argument. It solely appeals to the sympathy of the complaining witness rather than the facts in evidence, and based on those remarks I would respectfully ask the court even after all week, to at least reprimand the prosecutor and declare a mistrial.

\* \* \* \* \* \*

[COUNSEL FOR SMALLWOOD]: Judge, I also join in that motion asking for a mistrial.

determine whether substantial prejudice resulted. *See Mitchell v. United States,* 569 A.2d 177, 183 n. 5 (D.C.1990). In particular, we must consider "the gravity of the misconduct, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *See id.; Irick v. United States,* 565 A.2d 26, 32 (D.C.1989). When an appellant has properly preserved objections, the court must determine whether "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, the judgment was not substantially swayed by the error." *Portillo v. United States,* 609 A.2d 687, 690 n. 5 (D.C.1992); *see Irick,* 565 A.2d at 32; *Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980).

■ We conclude that the prosecutor's comments referring to the assault on Jackson amounted to misconduct. These references to the assault directly followed the prosecutor's comments about Jackson's confrontations by members of Smallwood's family. The sequence of these references, therefore, had the improper effect—and, indeed, appeared intended to have the effect—of linking Smallwood and, inferentially, his apparent confederate, Carpenter, with the assault on Jackson when there was no record evidence whatsoever that anyone connected with either appellant assaulted Jackson six weeks before trial. *See Lewis v. United States,* 541 A.2d 145, 147 (D.C.1988) ("prosecutor's argument constituted a clear misstatement of the evidence and, as such, was misconduct").

■ We also conclude that the prosecutor's final statement to the jury was an attempt to appeal to the jurors' sympathies and, therefore, was improper closing argument. *See Hart v. United States,* 538 A.2d 1146, 1150 (D.C.1988) ("prosecutor ... transgressed the line into impropriety by appealing to the jury to render a verdict based upon a larger policy, and upon their own fears of being victimized ...."); *Powell v.*

*United States,* 455 A.2d 405, 410 (D.C.1982), *reh'g denied,* 458 A.2d 412 (1983) (prosecutor improperly appealed to jurors' fears of violence and asked them to "send a message" that the community does not tolerate violence).

■ The prosecutor's misconduct in linking the assault on Jackson to Smallwood's family and in appealing to the jury's passions had a devastating prejudicial impact. *See Bowler v. United States,* 480 A.2d 678, 686 (D.C.1984) (prosecutor's comments in closing argument concerning gory and graphic details of death scene, personal opinion of credibility of witnesses, and witnesses' conduct and testimony not based on evidence introduced at trial constituted plain error); *Powell,* 455 A.2d at 410. Basically, after strongly suggesting that appellants were responsible, through their families, for beating up Jackson a few weeks before trial, the prosecutor in effect was telling the jury: "convict Smallwood and Carpenter, whether Jackson has been telling the truth or not, for without the intimidating impact of those convictions on the community, Jackson—who has to go back to the same dangerous neighborhood—will get beat up again and again." That line of argument, based on improperly allowed testimony, coupled with an erroneous comment about where Jackson lived, see *supra* note 9, was highly improper.

■ Furthermore, although Judge Ryan attempted to cure the prejudicial effect of the prosecutor's last statement to the jurors by instructing them not to have "prejudice, fear, sympathy, or favor," [11] that instruction—which did not even specifically address the prejudicial statement, let alone redress the references linking the assault on Jackson to appellants—did not cure the prosecutor's inappropriate summation. *See Lewis,* 541 A.2d at 148–49 (prosecutor arguing facts not in evidence constitutes serious misconduct). Finally, because the prosecutor made two of his improper comments in rebuttal closing argument, defense counsel did not have any

---

11. Judge Ryan's instruction to the jury on this point was the following:

The function of the jury is to determine the facts. You are the sole and exclusive judges for the facts. You alone determine the weight,

the effect, the value of the evidence, and the credibility of the witnesses.

You should determine those facts without prejudice, fear, sympathy, or favor, solely from a fair consideration of the evidence.

opportunity to respond to those remarks. *See id.* at 149; *Powell,* 455 A.2d at 411 (prejudicial effect of misconduct compounded by timing of remarks in rebuttal argument).

■ We need not decide whether the erroneous admission of redirect testimony by witness Jackson, or the trial court's failure to censure the prosecutor's closing arguments, taken individually, amounted to reversible error. We are satisfied that both errors, taken together, cannot be held harmless. Jackson's redirect examination, over objection, as to events after Jackson attended Smallwood's lineup, when coupled with the prosecutor's comments in closing argument, resulted in prejudice requiring reversal of all convictions and a remand for a new trial. *See Menzies v. Procunier,* 743 F.2d 281, 289 (5th Cir.1984) (petitioner was denied a fair trial because of combined effect of testimony concerning alleged threats to witnesses by petitioner and prosecutor's closing argument referring to such threats).

*Reversed and remanded.*