**Deon R. RUSSELL, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 94–CF–1048, 96–CO–432.**

District of Columbia Court of Appeals.

Argued Dec. 12, 1996.

Decided Oct. 23, 1997.

Roberto Iraola, appointed by this court, with whom Benjamin B. Klubes and Barry Coburn, also appointed by this court, Washington, DC, were on the brief, for appellant.

Tina E. Sciocchetti, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, TERRY, Associate Judge, and BELSON, Senior Judge.

TERRY, Associate Judge:

Appellant Russell was charged with three counts of assault with intent to kill while armed,[1] three counts of arson,[2] two counts of malicious destruction of property,[3] and two counts of possession of a Molotov cocktail.[4] The charges were based on three incidents that occurred on October 13, October 14, and November 7, 1991. Although Russell was indicted alone for the October offenses, he was charged with a co-defendant, Kenneth Hahn, for the November offenses. Hahn eventually pleaded guilty to one count of malicious burning.[5] Russell went to trial and was convicted on two counts of assault with intent to kill while armed, two counts of arson, two counts of destruction of property, and two counts of possession of a Molotov cocktail, all arising out of the two October incidents. The jury acquitted him of all charges arising out of the November incident. Russell noted a timely appeal from his convictions.

About a year later, Russell's newly appointed appellate counsel filed on his behalf a motion to vacate his convictions under D.C.Code § 23–110 (1996), on the ground that his trial counsel had rendered ineffective assistance. Following oral argument, the trial court denied the motion with respect to the October 14 arson, but vacated all of Russell's convictions based on the October 13 arson. After Russell appealed from that order, this court consolidated the new appeal with Russell's original appeal.

Before this court Russell makes several arguments for reversal, but we need consider only two. We hold that the evidence was sufficient to support his convictions related to the October 14 incident. However, we must reverse those convictions because the prose-

---

1. D.C.Code §§ 22–501, 22–3202 (1996).

2. D.C.Code § 22–401 (1996).

3. D.C.Code § 22–403 (1996).

4. D.C.Code § 22–3215a (a) (1996).

5. D.C.Code § 22–403 (1996).

cutor, in his summation, argued facts not in evidence, and because the trial court gave an aiding and abetting instruction which was also without support in the evidence.[6]

## I

### A. *The Government's Evidence*

Deon Russell and Angela Card were the parents of a son named Christopher, born in March 1991. The three lived together from March through April 1991, and again from May through September 1991, in the apartment of a woman named Glynis Hendrix.[7] Ms. Card testified that Mr. Russell was an extremely possessive father who took his son out "all day and half the night" and prevented her from taking the child anywhere. When Card tried to touch the baby or to "do anything tiny," Russell would argue with her about it. Russell's mother later testified that her son "always had that baby with him." On one occasion, when Christopher was only a few months old, Russell came to court and "went through procedures" to obtain custody of Christopher, but his efforts to do so were apparently unsuccessful.

In late September 1991, Ms. Card and her children moved from Ms. Hendrix's apartment to the home of Ms. Card's mother on Randolph Street, Northwest. She did not tell Russell that she was moving out and taking their son with her, nor did she reveal where she was going. Card testified that she made no effort to contact Russell after she moved out. He found out where she was, however, and paid her a visit at her mother's home. He asked her to give him the baby or to come back with the baby and live with him, but she refused.

On Sunday, October 13, Angela Card took her children to church. On the way there, she saw a car in which she had previously seen Mr. Russell "riding around" in the

neighborhood. Ms. Card became uneasy at the sight of the car because Russell had threatened on several occasions to take Christopher from her and kill her. After leaving church, Card went to the home of a friend. While she was there, Russell and another man came to the door and knocked. Although it is not clear that Russell knew Ms. Card was there, Card surreptitiously looked out the window and recognized Russell, noting that he had a short haircut with a blond "tail" in the back.[8] Later that day Ms. Card returned to her mother's home.

At approximately 8:20 p.m. on October 13, Ms. Card and her mother, sister, and two children were watching television in the dining room when they heard the sound of breaking glass and saw a fire in the living room. The women used water and blankets to put out the fire, then called the police and fire departments. Fire Investigator Willie Drummond determined that a Molotov cocktail—a Coca-Cola bottle filled with gasoline and a wick—had been thrown through the window, setting the drapes on fire. Fearful of a repeat attack, Ms. Card sent her children to spend the night with a relative. She and her mother then placed several buckets of dirt in the dining room and moved some furniture in order to clear an unobstructed exit from the house. They also lay down on the floor so that they could not be seen from outside.

A few hours later, shortly after midnight on October 14, Ms. Card and her mother were lying on the dining room floor when a second Molotov cocktail came flying through the broken window, starting a second fire. The women quickly extinguished the fire with the dirt they had collected and again called the police and fire departments. Investigator Drummond returned to their home and found a beer bottle filled with flammable liquid and a wick. Neither of the bottles thrown into the home contained Russell's

---

6. Russell also argues that the trial court erred in denying his § 23–110 motion. Our reversal of the judgment of conviction makes the § 23–110 motion moot.

7. Ms. Hendrix and her son also lived in the apartment, along with various other persons at various times, including Russell's mother and sister and Card's daughter.

8. She also recognized Russell's companion as someone she had seen in Russell's company a few times in the past, but she did not know his name. This man had a "rough" haircut, "and his face was like disfigured a little." He was not further identified.

fingerprints, nor did a third bottle that was found in the back yard the next day.

A neighbor, Grayson Dixon, testified that he heard the sound of breaking glass while watching television in the early morning hours of October 14.[9] Dixon looked out from his second floor window and, from a distance of twenty to thirty feet, saw someone running in his direction, away from the Cards' house. This person ran past Dixon's house and disappeared around the corner. A street light directly in front of the Cards' house illuminated the area. Dixon went outside and described the person to police as a man "about five ten, five eleven, about a hundred and forty to a hundred and fifty pounds ... [with] a dark color baseball cap on, with ... a little plait ... in the back of his head, or the center."[10] Mr. Dixon was not asked to make an in-court identification, and he did not do so. On cross-examination, he acknowledged that he did not see the person's face, and that he could not be certain whether it was a man or a woman (though he had said earlier that it was a man).

Ms. Card testified that she suspected Russell because of certain statements she had heard him make during a telephone conversation a few months earlier. While she was talking to him on the phone, she heard him tell another man, who was apparently standing nearby, to get a bottle of gasoline. A few minutes later, she heard the other man say that he needed a can for the gasoline, and Russell told him to look in a trash bag. When the other man found a can, Russell exclaimed, "Bingo!"

Glynis Hendrix, who lived with Ms. Card and Mr. Russell during the summer of 1991 and was also the mother of one of Russell's children, testified about a conversation in which Russell discussed gasoline and a bottle. Hendrix said that shortly after Card moved out of her apartment, she overheard a conversation among Russell, Kenneth Hahn, and a man named Poochie in which the three discussed setting fire to an unspecified house by using a bottle of gasoline. Hendrix further testified that Hahn had taken a television set, a stereo, and some tapes that belonged to Mr. Russell. When Russell demanded that his property be returned, Hahn replied that he no longer had it, but that he would "do anything ... to repay [Russell] for the stuff he took."[11]

A few weeks later, on November 7, the fire department came to the Card residence to put out a fire under the back porch that was later found to have been deliberately set with gasoline. Two gasoline cans were discovered in the rear of the house. One belonged to the Cards; the other did not, but its ownership could not be established. There was no evidence before the jury that connected either appellant Russell or Kenneth Hahn to the November 7 incident.[12]

### B. *The Defense Evidence*

Joyce Goodall, who had been a friend of appellant Russell for several years, testified that on October 13, at approximately 7:45 p.m., she was watching television in her living room when Russell called her from the lobby of her apartment building. She went downstairs and sat in the lobby, talking to Mr. Russell, for the next two hours. When Russell asked her to join him at a club, however, she declined and returned to her apartment.

Rosalyn Russell, appellant's sister, who had lived with her brother and Ms. Card during the summer of 1991, testified that her brother was a good father who always stayed with his son, and that although he used to wear a plait in his hair, "that was before [Ms.

---

9. Dixon was a private investigator with seventeen years' experience as an investigator for the District of Columbia Public Schools. He was aware that there had been a fire at the Cards' home earlier in the evening, and that Ms. Card and her mother were "having problems" with someone who they feared might "come back for them."

10. A plait is a small braid that can be of varying length depending on the length of the wearer's hair.

11. Hahn did not testify at Russell's trial.

12. Hahn was arrested at the scene and eventually pleaded guilty to a charge arising out of the November 7 firebombing. The jury, however, never learned of Hahn's involvement or his plea.

Card] came into the picture."[13] Janet Russell, appellant's mother, testified that he was very close to his son and had taken steps to obtain custody of him. She also testified that Angela Card appeared one day on her doorstep with Christopher, saying that her mother had thrown her out.

### C. *The Prosecutor's Comments and the Court's Instructions*

In his opening statement, the prosecutor told the jury that Deon Russell had "enlisted an accomplice, a man named Kenneth Hahn, who has had his day in court." He said that Hahn and Russell had planned and carried out several firebombings at the Card residence, that Hahn had been arrested at the scene of the November 7 arson, and that Ms. Card had identified him as someone she had seen at the door on November 7 just before the fire was discovered.

Despite these comments, the government at trial presented *no evidence whatever* connecting Hahn with any of the three firebombings. The jury never learned from any witness that Hahn had been arrested or identified on November 7, nor was he identified in any way as having been associated with the firebombings on October 13 and October 14; indeed, he was not even charged with any involvement in the October incidents.

In his closing argument, the prosecutor argued for a guilty verdict on the theory that Russell had committed all three firebombings himself, but he also made repeated references to Kenneth Hahn's culpability for those attacks and his relationship to Russell. The prosecutor told the jury that even if Russell was not the person who had committed the November 7 arson, he could be convicted on the theory that he had aided and abetted Hahn. He said Russell would be responsible for the attacks as an aider and abettor because "he was working together with his

accomplice, Kenneth Hahn, to carry out that end, to attack Angela Card, using these Molotov cocktails and burning her house." The prosecutor added that although Ms. Card did not know Kenneth Hahn, "he was the man that tried to set the house on fire . . . and he was the man that turned himself in that day [November 7]. They [the police] brought him back, and [Ms. Card] identified him at that point." After a brief discussion of the law of aiding and abetting, the prosecutor said:

> [T]he key part I want to emphasize about [aiding and abetting] is [that] . . . you don't have to do something to be held responsible for it if you are in that joint enterprise with somebody.
>
> So, in other words, even if he [Russell] didn't throw that Molotov cocktail through the front window on the first day and he didn't set the porch on fire on November 7th, he is still responsible for it. And that is because he was working together with his accomplice, Kenneth Hahn, to carry out that end, to attack Angela Card using these Molotov cocktails and burning her house. That's aiding and abetting.

There was no evidence before the jury to support any of the prosecutor's comments about Kenneth Hahn, as the government concedes,[14] nor was there any evidence that Russell had aided and abetted Hahn (or that Hahn had aided and abetted Russell) in any criminal activity.

In his rebuttal argument, the prosecutor reiterated his earlier point that Russell had personally committed the two October arsons, but he also repeated his suggestion that the jury could find Russell guilty on the alternative theory that he had aided and abetted Hahn:

> [W]e know Kenneth Hahn was involved because they got him red handed, cold busted, on November 7th at the scene of the crime. Well, how is Kenneth Hahn linked to all this? . . .

---

13. Rosalyn Russell said that when she lived in the apartment with her brother and the others, she cut her brother's hair for him.

14. The government admits that the prosecutor's comments were improper. It states in its brief:

> The government concedes that the prosecutor's assertions in his opening statement and

> closing arguments regarding co-defendant Hahn—that the police had apprehended Hahn in connection with the November 7 arson and that Angela Card had identified Hahn on the scene—were not based on facts and were therefore impermissible.

He is linked to this through Deon Russell, his buddy, his accomplice, the man he was indebted to, indebted to. Why was he setting the house on fire? Why was he starting that fire at the back of the house? He didn't have any personal beef against her. There's no evidence of that in this case.

\* \* \* \* \*

... Let's say, just for the sake of argument, Kenneth Hahn did all three of [the firebombings] and then set the fire on the back porch. Does that mean [Russell] walks out of here? Uh-uh.... Hahn was doing this because Deon Russell put him up to it. That's why he was doing it.... He did it because Deon Russell wanted him to, the joint enterprise, the teamwork that you will hear about in the aiding and abetting instruction. That's what it was.

The trial court, at the government's request, gave the standard instruction on aiding and abetting.[15] Defense counsel made a timely objection to the instruction, but the court overruled it, relying in part on the "undisputed fact that Mr. Hahn was arrested on or about November 7 as a result of the fire that was set at 551 Randolph Street, Northwest." Defense counsel did not challenge or disagree with the court's statement, even though there was no evidence of this "undisputed fact" before the jury.

## II

Russell first contends that the evidence was insufficient to support his convictions related to the October 14 firebombing. In considering such a claim, we view the evidence "in the light most favorable to the government, keeping in mind the jury's right to assess credibility and to draw reasonable inferences from the evidence it has heard." *Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991) (citations omitted). The evidence may be deemed sufficient "even if it does not exclude every reasonable hypothesis other than guilt." *Irick v. United States,* 565 A.2d 26, 30 (D.C.1989) (citations omitted). In this case, although the evidence was not very

strong, we conclude that it was strong enough to withstand a motion for judgment of acquittal.

First of all, there was evidence that Mr. Russell had a motive to harm Ms. Card. Witnesses for both sides testified that he was extremely attached to his infant son and hostile toward Ms. Card's contacts with him, even though she was the child's mother. Card also testified that Russell had threatened her on several occasions, and Russell's mother said that he had unsuccessfully initiated custody proceedings earlier in 1991. The jury could reasonably infer that Russell was motivated by love for his son and anger at Ms. Card for taking the child and moving out of the apartment that they shared.

The government also introduced evidence of two conversations linking Mr. Russell to the potential use of Molotov cocktails. Angela Card testified that she heard Russell tell an unidentified third party to get a bottle of gasoline. Some time later, after Russell and Card had separated, Glynis Hendrix overheard Russell, Kenneth Hahn, and another man discuss setting fire to a house by the use of a Molotov cocktail.

The critical testimony, of course, was that of Grayson Dixon, for that was the only evidence of Russell's presence at the scene of the crime. Mr. Dixon stated that he saw someone fitting Russell's description running from the Card residence immediately after the October 14 arson. He described that individual as wearing a plait in the back of his head, and Angela Card testified that she had seen Mr. Russell earlier in the day with such a "tail" at the back of his head. Dixon's view of the scene was unobstructed and illuminated by a street light. Although Dixon's identification was weak, we think the trial court had a rational basis for saying that Dixon provided a "reasonably accurate description" of Mr. Russell. We conclude that "a reasonable person could find [Dixon's] identification convincing beyond a reasonable doubt, given the surrounding circumstances." *Beatty v. United States,* 544 A.2d 699, 701 (D.C.1988) (citations omitted).

---

**15.** CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.02 (4th ed.1993).

## III

 "It is improper for an attorney to make an argument to the jury based on facts not in evidence or not reasonably inferable from the evidence." *Morrison v. United States*, 547 A.2d 996, 999 (D.C.1988) (citations omitted). The government concedes in its brief on appeal that the trial prosecutor [16] "erroneously advised the jury (without objection by appellant) that it had heard evidence concerning Hahn's arrest and identification at the scene of the November 7 crimes when, in fact, it had not." In a footnote the government goes on to say that "during the trial the prosecutor appears to have been sidetracked and simply forgot to elicit any evidence from Card about the circumstances of the November 7 arson." Such candor is commendable, but it will not save the day. It is simply no excuse to suggest half-heartedly, as the government now does, that the prosecutor "simply forgot" that he had failed to prove a major part of his case. On the contrary, we think his lapse was inexcusable, indeed incomprehensible.[17]

The government pins its hopes on the fact that defense counsel did not object to the prosecutor's closing argument, asserting that Russell must demonstrate plain error in order to win reversal. While this is essentially correct,[18] we have no difficulty on the present record in finding plain error, which we have defined as error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc) (citations omitted); *see United States v. Olano*, 507 U.S. 725, 736–737, 113 S.Ct. 1770, 1778–1780, 123 L.Ed.2d 508 (1993). The prosecutor based a substantial part of his argument on the notion that Russell aided and abetted Hahn in setting the three fires, including the one on October 14 which led to Russell's conviction. But there was not one shred of evidence before the jury connecting Hahn in any way with any of those fires. In similar circumstances we found plain error in *Lewis v. United States*, 541 A.2d 145, 148–149 (D.C.1988). We see no material difference between this case and *Lewis*.[19] We hold, accordingly, that the trial court committed plain error by failing to intervene *sua sponte* and correct the prosecutor's egregious misstatements of the evidence. *See Irick v. United States, supra*, 565 A.2d at 33.[20]

 Compounding the prosecutor's blunder was the aiding and abetting instruction, which the court gave at the prosecutor's request.[21] There was, as we have said, no

16. The government is represented by new counsel on appeal. The name of the trial prosecutor does not appear in this opinion.

17. There is no indication, however, that the prosecutor acted in bad faith. *See McGrier v. United States*, 597 A.2d 36, 40–41 (D.C.1991).

18. Not only did defense counsel fail to object to the prosecutor's summation, but early in his own summation he said that a government witness had testified that "this was done by Mr. Hahn." Read in context, "this" refers to all three firebombing incidents. In fact, however, no government witness had so testified.

19. In *Lewis* the prosecutor made two factual statements in her closing argument that were directly contrary to the testimony, and said in addition that the police had "resolved" the case by arresting the defendant. We held that the first two comments "reflect[ed] an effort to argue facts that clearly were not in evidence, and [that] the third, while perhaps less egregious, suggested that the fact of the arrest itself conclusively demonstrated guilt." 541 A.2d at 148. We found plain error and reversed the conviction because "[t]he prosecutor's improper remarks each

served substantially to buttress the government's otherwise less-than-compelling case." *Id.* at 149. We reach the same conclusion here.

20. We said in *Irick*:

[A]lthough appellants' complaint is primarily with the prosecutor, it is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel. Such error or abuse may, to be sure, embrace not only incorrect rulings but also, on occasion, failure to intervene *sua sponte* when such intervention is called for ... or to react with sufficient promptness and vigor to prosecutorial misdeeds.

565 A.2d at 33 (citations omitted).

21. After both counsel had made their closing arguments to the jury, the court and counsel discussed the instructions which the court proposed to give, and at that time defense counsel said he was satisfied with them. The next day, however, he objected to the court's aiding and abetting instruction—after the court gave it, but before the jury retired. Counsel maintained that there was not enough evidence to support an aiding and abetting instruction, but the court

evidence whatsoever that Russell aided and abetted anybody else (or that anybody else aided and abetted him) in committing the crimes of which he was convicted. Indeed, the government concedes in its brief that there was insufficient evidence to convict Russell as an aider and abettor, arguing only that the evidence was sufficient to convict him as a principal.

 In *Brooks v. United States,* 599 A.2d 1094 (D.C.1991), the trial court gave an aiding and abetting instruction, although there was no evidence that the defendant aided and abetted anyone. We reversed his burglary conviction on the ground that "there was no evidentiary basis for an instruction predicated on the notion that Brooks was an aider and abettor and someone else the principal." *Id.* at 1098. Although the principal's identity need not (and sometimes cannot) be proved, there must at least be some evidence that there was in fact a principal whom the defendant aided and abetted. "One cannot aid or abet himself." *United States v. Martin,* 747 F.2d 1404, 1407 (11th Cir.1984) (cited in *Brooks,* 599 A.2d at 1099). In light of *Brooks,* we hold that the aiding and abetting instruction in this case was erroneously given, and that, given the

prosecutor's misstatements and the weakness of the government's identification evidence, the error was not harmless. *See also Payton v. United States,* 305 A.2d 512, 513 (D.C. 1973).

## IV

The prosecutor's comments would be sufficient in themselves, under *Lewis v. United States,* to constitute plain error. When the trial court's erroneous aiding and abetting instruction is also taken into account, we cannot avoid the conclusion that "the very fairness and integrity of the trial" were jeopardized. *Watts, supra,* 362 A.2d at 709. The judgment of conviction is therefore reversed. The case is remanded for a new trial or for other proceedings consistent with this opinion.

██ *Reversed and remanded.*[22]

**22.** We note that the trial court lacked jurisdiction to vacate Russell's October 13 convictions while his direct appeal was pending. Its order purporting to do so is therefore a nullity. *See, e.g., King v. United States,* 271 A.2d 556, 558–559 (D.C.1970).