**Kevin CLAYBORNE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 97–CF–1618.**

District of Columbia Court of Appeals.

Argued Nov. 23, 1999.
Decided May 25, 2000.

---

Gretchen Franklin, Public Defender Service, with whom James Klein and Jennifer MacKay Pyle, Public Defender Service, were on the brief, for appellant.

Sarah T. Chasson, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth H. Danello, and J. Patrick Rowan, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, REID, and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Appellant Kevin Clayborne was convicted after a jury trial of second degree murder while armed, possession of a firearm during a crime of violence, and carrying a pistol without a license. He contends that the trial court erred (1) in allowing the government to insinuate bias without sufficient foundation during cross-examination of a key defense witness and in closing argument; and (2) in allowing the government to rebut his testimony on cross-examination concerning a collateral matter by calling

the decedent's sister to testify in the government's rebuttal case. Finding no reversible error, we affirm Clayborne's convictions.

## I.

On February 1, 1996, Artis "Petey" Burns died from a gunshot wound to the head that was inflicted shortly after midnight on January 7, 1996, in the vicinity of Eaton Road in the Barry Farms section of Southeast Washington, D.C. The government's theory at trial was that Kevin "K.K." Clayborne shot Burns in retaliation for Burns' participation in the murder of Clayborne's friend, Joseph Freeman, the previous night.

The government called two eyewitnesses to the events immediately surrounding the shooting, Tanisha Williams and Robert White. Tanisha Williams was in an upstairs bedroom in the house of her mother, Kirsten Williams, when she looked out the window and saw Burns standing out front by a mailbox. Williams testified that she saw two men approach Burns, one of whom she recognized as "K.K.," i.e. Clayborne, whom she knew. She did not recognize the other man. Williams stated that as Burns backed away from the two men, she saw K.K. reach out and fire several shots at him. Burns fell and the two men fled the scene.

Robert White testified that he was on his way to Kirsten Williams' house on Eaton Road when he saw two men emerge from an alley and approach Burns on the street. White stated that he could not identify the two men because they had on hoods and their backs were to him. Burns and the two men walked into an alley, and White lost sight of them. Moments later, as White was standing at the threshold of Williams' house, he heard gunshots from the alley.

Burns was able to crawl to a neighbor's house, where White, Tanisha Williams and several other bystanders attempted to help him. One of the bystanders, Clarence

Aull, asked Burns who shot him. White and Williams both testified that Burns, spitting blood and struggling to speak, managed to answer that "K.K." shot him.

Clayborne challenged the accounts given by Williams and White on multiple fronts. Williams and White contradicted each other in the details of their descriptions of the events leading up to and following Burns' shooting. Moreover, when the police first interviewed Williams and White, neither witness mentioned seeing Clayborne or hearing Burns identify Clayborne as his assailant. White did not report that he had heard Burns name "K.K." as the shooter until four months had elapsed. Williams likewise delayed in furnishing that critical piece of information, and she repeatedly told the police that she did *not* see the face of the man who shot Burns. Only after Williams learned that Clayborne was a suspect, and a homicide detective visited her at the homeless shelter where she was living and promised to help her obtain a Housing and Urban Development "Section 8" housing certificate if she would cooperate, did Williams say that, in fact, she did see who shot Burns. Only then did she identify Clayborne as the shooter. Twelve days later Williams received the housing certificate, which allowed her to move into a two-bedroom, $834–a–month apartment for free.

In trying to discredit Williams and White, the defense also focused on their testimony that Burns said "K.K." when Clarence Aull asked Burns who shot him. Medical evidence, including the fact that Burns' jaw was fractured and bullet fragments had lodged in his tongue and soft palate, raised questions about Burns' ability to say anything. Burns' treating physician, a trauma surgery expert, testified that in his professional opinion, Burns could not have talked and breathed at the same time because of all the blood in his mouth and throat. MPD Officer Craig Royal, the first police officer on the scene, testified that when he asked Burns two or three times who shot him, Burns did not

answer. Officer Royal never heard Burns say that "K.K." or Clayborne shot him.

The defense also called Clarence Aull to testify. Aull was a friend of both Burns and Clayborne. Aull testified that he asked Burns twice who shot him, but—contrary to the testimony of White and Williams—Burns was unable to answer. Aull testified that Burns' friend Marcus, also on the scene following Burns' shooting, asked as well, and he too received no response. Aull denied that Burns named "K.K." as his assailant.

Clayborne himself testified, declaring that Burns was his friend and that he had nothing to do with his murder. Clayborne acknowledged that in early January 1996 he was distressed over the recent murder of his friend Freeman, but he stated that he had not heard that Burns was implicated in that crime. Clayborne acknowledged that he could not say where he was when Burns was shot. He testified, however, that a month or two had passed between the shooting and when he first heard rumors that he was involved.

The issues raised in this appeal concern, first, the government's cross-examination of Aull for bias; second, the government's rebuttal argument to the jury based on that cross-examination; and third, the government's presentation of Burns' sister Katrice Green as a rebuttal witness. We discuss each of those issues in turn.

## II.

### Cross-examination of Clarence Aull for Bias

In cross-examining Aull, the government sought to discredit his testimony that

Burns did not identify Clayborne by establishing that Aull had a strong motive not to be known as a "snitch." As evidence bearing on this motive, the government elicited that Aull had had several friends in addition to Burns who had been murdered; that Aull himself had been shot on two separate occasions; and that Aull never identified his own assailants, impliedly because he feared the consequences of snitching. Clayborne contends that the trial court erred in allowing the government to elicit this testimony, because the government never proffered a basis for believing either that the murders of Aull's friends would prompt Aull to lie, or that Aull was lying when he said he could not identify his own assailants. Absent such a basis, Clayborne argues, the evidence was irrelevant, and the trial court abused its discretion in admitting it and thereafter in allowing the government to draw prejudicial inferences from this evidence in argument.

### The Questioning

The prosecutor began his cross-examination for bias by eliciting the fact that several ("like 6 or 7") of Aull's friends in the Barry Farms neighborhood had been killed.[1] Defense counsel objected to this area of questioning on relevance grounds. The trial court overruled the objection, deeming the questioning "simply essential bias cross-examination" because it bore on why Aull might not want to incriminate his friend Clayborne.[2] The prosecutor then asked Aull, "And yet you're not able to say who the killers were in any of those cases, are you?" Defense counsel immediately objected to this question, the court sustained the objection, and Aull did not an-

1. The prosecutor disclosed that his basis for asking Aull about his murdered friends was a conversation with Aull about that subject two weeks earlier.

2. The trial court observed that because Aull already had lost a number of friends, "maybe he doesn't want to see another young friend of his convicted of a homicide." Defense counsel questioned the plausibility of this rationale, which was not a theory the prosecu-

tion advanced. In response the court reiterated that it considered the cross-examination to be relevant. As we read the colloquy, the theory of relevance which the trial court articulated may have been offered as merely one example of how the killings of several of Aull's friends might be relevant, not as the sole reason. It was, however, the only specific reason the trial court gave.

swer it.[3] The prosecutor next asked Aull about the occasions on which he himself had been shot. Defense counsel objected to this examination, again on relevance grounds, but the trial court ruled that it was relevant (without explaining why). The court accordingly permitted the prosecutor to elicit that Aull was shot in his shoulder in November of 1995 and in his hip or thigh in January of 1996, and that one of these incidents occurred in Barry Farms and both occurred in Southeast Washington, D.C.

The prosecutor then proceeded with the following examination, to which defense counsel did not object:

Q. And you're not able to, to say who did either of those shootings, are you?

A. No, sir.

Q. And you realized that if you did see who did that, you did tell the police you'd have to go to court on it, don't you?

A. Yes.

Q. But you don't have to go to court on anybody for either of those cases because you say you didn't see who did it, right?

A. Right.

The prosecutor moved on to ask a series of questions, not challenged either in the trial court or on appeal, which more directly raised the question of whether Aull had a motive not to be known as a "snitch," i.e., one who willingly provides information to police. In answer to these questions, Aull frankly admitted that he wanted to continue to be able to "hang out," every day with his friends in Barry Farms, and that it would be harder for him to do so if his friends thought he was a snitch. He agreed with the prosecutor that if Aull were labeled a snitch, his standing among his peers would be undermined because they "would be worried about whether or not .... [he would] snitch on them some time...." Aull thus acknowledged that he did have a motive not to be known as a snitch—and hence not to implicate Clayborne in Burns' murder. Aull insisted, however, that if he had heard Burns identify "K.K." as his assailant, he would say so even if it did mean snitching.[4]

*Analysis*

Bias or testimonial motivation is always a proper subject of cross-examination. *See, e.g., McGriff v. United States,* 705 A.2d 282, 285 (D.C.1997). The exposure of bias "may be a crucial determinant in the jury's assessment of the trustworthiness of a witness." *Springer v. United States,* 388 A.2d 846, 855 (D.C.1978).[5] Hence a party's effort to demonstrate bias "may properly solicit over a wide range any information of potential value to the trier of fact in the assessment of credibility." *Wynn v. United States,* 130 U.S.App. D.C. 60, 62, 397 F.2d 621, 623 (1967) (footnote omitted); *accord, Samuels v. United States,* 605 A.2d 596, 598 (D.C.1992).

Cross-examination for bias is subject to reasonable limits. The examiner may not manufacture allegations of bias out of thin air or insinuate facts that she knows or believes are false. "False insinuations in a question, even if followed by an indignant denial from the witness, undoubtedly leave a trace of prejudice in the jury's mind." *United States v. Pugh,* 141 U.S.App.D.C. 68, 71, 436 F.2d 222, 225 (1970). *Cf. Ali v. United States,* 520 A.2d 306, 313 (D.C.1987) (a party "may not attempt to manufacture evidence by creating an impression in the minds of the jurors through questions that imply the existence

---

3. Clayborne argues that the intended implication of this question was that Aull's purported inability to identify the killers of any of his friends confirmed that he had a motive not to be a snitch. Such an implication would be valid only if, in fact, Aull was able to identify who killed his friends. No evidence was presented that Aull could do so.

4. Defense counsel chose not to conduct redirect examination of Aull.

5. A portion of *Springer* not pertinent here has been overruled. *See Bassil v. United States,* 517 A.2d 714, 717 n. 5 (D.C.1986).

of facts"). The examiner must have a reasonable factual foundation, such as the credible report of another witness or one's client, or at least a "well-reasoned suspicion" that the circumstances indicating bias might be true. *See Scull v. United States*, 564 A.2d 1161, 1164 (D.C.1989); *Pugh*, 141 U.S.App.D.C. at 71, 436 F.2d at 225. This foundational requirement is a "fairly lenient" one. *Carter v. United States*, 614 A.2d 913, 919 (D.C.1992). Especially in criminal cases, cross-examination is often genuinely exploratory rather than directly accusatory, for counsel often cannot know in advance what an opposing party's witness may have to say. *See Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624 (1931). The requirement of a good faith basis for bias cross-examination is therefore flexible as well as lenient. The more pointed and directly accusatory the examiner's question, the stricter the foundational requirement becomes, while a "very slight" basis is enough to support "nonaccusatory questions" on cross-examination. *United States v. Fowler*, 151 U.S.App.D.C. 79, 81, 465 F.2d 664, 666 (1972). If opposing counsel objects to bias cross-examination based on a claimed lack of foundation, the examiner must proffer to the court for its evaluation the basis for her genuine belief that her questioning is well-grounded and hence that the answers may be probative of bias.[6] *See Jones v. United States*, 516 A.2d 513, 517 (D.C.1986).

 The trial court may exclude evidence of bias if it finds that the probative value of the evidence is "substantially outweighed" by the danger of unfair prejudice.[7] *(William) Johnson v. United States*, 683 A.2d 1087, 1090 (D.C.1996) (en banc). This standard tilts in favor of "the admission of as much relevant evidence as reasonably possible." *Id.* at 1099. We adhere to the view that probative evidence of bias, like probative evidence generally, "should not be excluded because of 'crabbed notions of relevance or excessive mistrust of juries.'" *Allen v. United States*, 603 A.2d 1219, 1224 (D.C.1992) (en banc) (quoting *Riordan v. Kempiners*, 831 F.2d 690, 698 (7th Cir.1987)).

 "[T]he evaluation and weighing of evidence [pertaining to bias] for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great deal of deference to its decision." *Mercer*, 724 A.2d at 1185 (quoting *(William) Johnson*, 683 A.2d at 1095); *cf. Reed v. United States*, 452 A.2d 1173, 1178 (D.C.1982) ("trial court has broad discretion in regulating the extent and scope of cross-examination of witnesses with respect to bias"). An exercise of judicial discretion "will not be reversed unless it appears that it was exercised on grounds, or for reasons, clearly untenable or to an extent clearly unreasonable." *(James) Johnson v. United States*, 398 A.2d 354, 363 (D.C.1979) (quoting *Bringhurst v. Harkins*, 122 A. 783, 787 (Del.1923)). In examining the reasonableness of discretionary rulings made in the middle of trial, such as a ruling to permit cross-examination, we

6. Consistent with the exploratory nature of cross-examination and the leniency of the foundation requirement, the proffer need not be exhaustive or particularly compelling. *See, e.g., Best v. United States*, 328 A.2d 378, 382 (D.C.1974); *Roundtree v. United States*, 581 A.2d 315, 328 (D.C.1990).

7. For example, the trial court may find that probative value is lacking because the charge of bias is based on nothing more than "an improbable flight of fancy." *Pugh*, 141 U.S.App.D.C. at 71, 436 F.2d at 225. Or the court may find that weak evidence of bias is so potentially inflammatory that the danger of

unfair prejudice substantially outweighs its probative value. *See Mercer v. United States*, 724 A.2d 1176, 1184 (D.C.1999) (noting that "unfair prejudice" in this context "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one").

The trial court may also, with care, exercise its sound discretion to limit the presentation of otherwise probative evidence of bias for other legitimate reasons, as for instance where the evidence is overly repetitive. *See, e.g., Scull*, 564 A.2d at 1164.

bear in mind that the circumstances often do not permit "the amassing of a record and the enumeration of reasons." *Id.* at 365–66.. Accordingly we may, if necessary, "examine the record and infer the reasoning upon which the trial court made its determination." *Id.* at 366.

Under the foregoing principles, we are satisfied that the trial court did not abuse its discretion in permitting the challenged cross-examination. Contradicting White and Williams, Aull denied that Burns named "K.K." as his assailant. That Aull was afraid to be known as a snitch among his peers was relevant because it explained why Aull might withhold information implicating Clayborne. That Aull lived in a violent milieu in which several of his friends had been murdered and he himself twice had been shot and seriously wounded suggested the gravity of the risk that Aull perceived if his criminal associates believed him to be a snitch. Clayborne disputes this logic because the government did not demonstrate that the *reason* Aull was shot or his friends were killed was to prevent snitching or as retaliation for snitching. In our view, however, such a demonstration was not required for Aull's personal experience with violence and murder to illuminate the reasons for

his disinclination to be a snitch. Hence Aull's testimony about this experience was relevant because it bore on the *strength* of Aull's motive not to snitch on Clayborne—especially since Aull admitted the existence of that motive but asserted that he nonetheless would have said that Burns identified "K.K." if Burns actually had done so.

Turning to the question of whether or not probative value was "substantially outweighed" by the danger of unfair prejudice, there was no suggestion in the cross-examination that it was Clayborne or anyone associated with him who had killed any of Aull's friends or shot Aull. There was likewise no suggestion that Clayborne or anyone associated with him had done anything to cause Aull to fear the consequences of snitching or otherwise to dissuade Aull from testifying truthfully. *Cf. Jefferson v. United States,* 558 A.2d 298, 302–03 (D.C.1989) (prosecutor's implication that defendants were involved in witness intimidation was improper without evidentiary basis). We therefore fail to see any substantial risk of unfair prejudice to Clayborne that would have compelled the trial court to bar the government from eliciting the relevant evidence of Aull's acquaintance with violence.[8] *Cf. Carpenter v.*

---

**8.** As noted *supra* note 2, the trial court suggested that it was relevant that several of Aull's friends had been killed because that meant Aull might not "want to see another young friend of his convicted of a homicide." Clayborne persuasively argues that this theory of relevance is illogical and not supported by the evidence. We agree that this theory of relevance is too speculative. *See Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977) ("[r]elevant evidence is that which tends to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence"). But even if this theory was the trial court's only basis for admitting the testimony, which we do not assume, that ruling was nonetheless not erroneous inasmuch as the testimony was relevant for the reason explained above and posed no substantial risk of unfair prejudice to Clayborne that might outweigh its relevance. This is therefore not a case in which the trial court's discretionary balancing of probative value against prejudice was tainted by any error the

court made in identifying the reason why the evidence was relevant. *Cf. Clark v. United States,* 593 A.2d 186, 190, 192 n. 7 (D.C.1991) (trial court abused its discretion when it admitted highly prejudicial evidence based on a mistaken view of the relevance of that evidence, which was marginal at best). Nor do we view this as a case in which we are being asked, impermissibly, to sustain a ruling that should have been discretionary, but was not, on the theory that "discretion, properly exercised, *might* have led to the same result." *Wright v. United States,* 508 A.2d 915, 919 (D.C.1986) (emphasis added) (appellate court may not substitute its discretionary judgment for that of trial court). Rather, this is a case in which we affirm because the ruling was correct even though the trial court may have given the wrong (or no) reason to support it. *See Ibn–Tamas v. United States,* 407 A.2d 626, 635–36 (D.C.1979); *accord Wright,* 508 A.2d at 920 (citation omitted) (proper to sustain ruling, even if trial court exercised its discre-

*United States,* 635 A.2d 1289, 1292–94 (D.C.1993). In *Carpenter,* the defense cross-examined an eyewitness to an assault with her prior inconsistent statements and her long delay in telling the police what she saw. The witness said she had been afraid to be more forthcoming. On redirect examination, the government was permitted to elicit her explanation that "she had been afraid because the neighborhood in which the attack took place was a 'high crime' neighborhood in which 'people kill [snitches].'" *Id.* at 1292. We held that such testimony was relevant and admissible because it explained the witness' fear and therefore the reason why she previously had withheld her eyewitness account. *Id.* at 1294. *See also Smith v. United States,* 687 A.2d 1356, 1368 (D.C.1996) (witness' explanation of what happens to those in his neighborhood who help the police admissible to explain failure of witness to come forward voluntarily), *aff'd, Smith v. United States,* 709 A.2d 78 (D.C. 1998) (en banc).

The issue is different with regard to the cross-examination of Aull about his purported inability to reveal who shot him. The prosecutor's questions implied that Aull deliberately refrained from identifying even his own assailants because he so badly needed to avoid being labeled a snitch. If that suspicion were credited, it would reinforce how strong a motive Aull had to avoid implicating Clayborne in the shooting of Burns. Analogizing this case to *Roundtree,* 581 A.2d at 315, Clayborne argues that it was improper for the government to plant such a suspicion in the minds of the jury absent any proffered factual basis to believe that Aull was able in fact to identify who shot him.

In *Roundtree* the issue was whether the defendant, who was charged with a sexual offense (sodomy), was entitled to cross-examine the complaining witness about allegations of sexual assault which she had made on other occasions. *See id.* This court held that the witness' past allegations would be probative as to her veracity only if those allegations were fabricated, and that the proposed cross-examination therefore was subject to the rules governing impeachment of witnesses with prior bad acts that have not resulted in criminal convictions. *See id.* at 323. Such impeachment is permitted "only where, at a minimum, (1) the examiner has a factual predicate for such a question, and (2) the bad act 'bears directly upon the veracity of the witness in respect to the issues involved [in] the trial.'" *Id.* (quoting *Sherer v. United States,* 470 A.2d 732, 738 (D.C. 1983)) (holding alleged perjury in another trial probative only if the perjury actually took place).

The comparison of the present case to *Roundtree* is imperfect in that a refusal by a victim to identify his assailant is not a "bad act" comparable to a false complaint or perjury. *Cf. Wheeler v. United States,* 470 A.2d 761, 769 (D.C.1983) (conduct must be at least "minimally in the nature of a criminal offense" to be covered by rules governing substantive admissibility of prior bad acts).[9] Nor was the issue in *Roundtree* framed or analyzed in terms of the right to cross-examine for bias or testimonial motivation.

▮▮ It is nonetheless true that Aull's claimed inability to identify his own assailants was relevant to the establishment of Aull's bias against being a snitch only if that claim was false. The government therefore was required to have a sufficient basis to believe the claim was false to justify the cross-examination. Since the

---

tion erroneously, if the court "had but one option").

9. Impeachment of a witness' credibility with evidence of a prior bad act is not to be confused with the introduction of evidence of a prior bad act for substantive purposes, e.g., to prove motive or intent. *See Sherer,* 470 A.2d

at 738 n. 5. In both cases, however, the risk of unfair prejudice is heightened, and the rules governing admissibility are accordingly more stringent because of the potential for jury misuse of evidence of conduct that is criminal in nature.

questions the prosecutor actually asked were not directly accusatory, and given the legitimately exploratory nature of cross-examination, this foundational requirement was not onerous—e.g., a "well-reasoned suspicion," *Scull*, 564 A.2d at 1164, or a "very slight" basis. *Fowler*, 151 U.S.App. D.C. at 81, 465 F.2d at 666.

■ Clayborne did not object to the prosecutor's questions relating to Aull's failure to identify who shot him, and the trial court did not interrupt the cross-examination *sua sponte*. As a result, the prosecutor was not called upon to make a proffer and did not do so. In view of the lack of contemporaneous objection, our review is circumscribed.[10] Under Super. Ct. Crim. R. 52(b) (2000) the burden is on Clayborne to establish that allowance of the cross-examination constituted plain error affecting his substantial rights. *See United States v. Olano*, 507 U.S. 725, 732–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). "[T]he error complained of must be so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976). We find no plain error here. From his rebuttal argument, which we address *infra*, it appears that the prosecutor reasoned that Aull likely saw and therefore could identify at least one of his assailants since he was shot in two separate incidents, once in the shoulder and once in the hip or thigh. The prosecutor's inference from this bare bones factual foundation is weak, but not so implausible that we must say that the prosecutor lacked a reasonable suspicion or the minimal basis required to ask the nonaccusatory questions he did. Moreover, the examination in this area was limited to three questions. Even assuming those questions were entirely unjustified, we·cannot take the further step and conclude that they were so clearly prejudicial that reversal is required under a plain error standard of review.[11]

## The Government's Rebuttal Argument

Clayborne challenges the propriety of the government's rebuttal closing argument concerning two issues: (1) whether the jury should believe that Tanisha Williams observed Clayborne shoot Burns even though her account conflicted with Robert White's account; and (2) whether the jury should believe Aull's testimony that Burns did not identify "K.K." as his assailant rather than the testimony of White and Williams that he did. Clayborne contends that in addressing these issues the prosecutor misused the testimony that Aull gave during his cross-examination for bias to argue without sufficient foundation that White and Aull were afraid to tell the truth about what they witnessed.

### The Rebuttal Argument

In the defense closing argument, Clayborne's counsel vigorously attacked

---

10. "For evidence contained in a specific question, the objection must ordinarily be made as soon as the question is stated and before the answer is given." *Mercer*, 724 A.2d at 1182 (quoting 1 Wigmore On Evidence § 18, at 797 (Tillers Rev.1993)). An objection not made when the question is asked still may be considered timely if the trial court remains able to take "appropriate and effective corrective action," e.g., by instructing the jury or granting a mistrial. *Coreas v. United States*, 565 A.2d 594, 600 (D.C.1989). In this case, however, Clayborne did not object even belatedly to the questions relating to Aull's failure to identify his assailants.

Clayborne did object earlier in the cross-examination, on relevance grounds, when the prosecutor first broached the subject of Aull's having been shot. Clayborne's objection at that time did not suffice, under the "continuing objection" rule, to excuse Aull's failure to object to the subsequent questions in a different, if related, area. *See Mercer*, 724 A.2d at 1182. The earlier objection based solely on lack of relevance was not calculated to apprise the trial court of Clayborne's contention that the prosecutor lacked a proper foundation for his subsequent questions.

11. The risk of unfair prejudice from the prosecutor's questions was diminished further by the trial court's instructions to the jury, given at the outset of the trial and again at its conclusion, that questions of counsel containing assertions of fact were not evidence.

Williams' credibility on several grounds, one of which was that Robert White contradicted Williams' account of the shooting with details implying that she really did not see it. In rebuttal the prosecutor argued that Williams was more credible than White, and that White's account should not be accepted at face value because he, by his own admission, was reluctant to come forward and say how much he actually saw. At one point during this argument, the prosecutor said:

> Now it's one thing, ladies and gentlemen, to sit up here and say I heard the victim, another person say the word K.K. when he was asked who shot him, because that was essentially all that he was asked on direct.

> But let me suggest to you, ladies and gentlemen, that it's quite another thing in a community like this, in Barry Farms that you heard a fair amount about from all the witnesses. It's quite another thing to get up here on the witness stand and say I saw it, I saw what happened and I can tell you who I saw do it.

Clayborne did not object to these remarks in the trial court.

The prosecutor also attacked Aull's credibility in his rebuttal argument. Suggesting that Aull was in "a very tough spot," the prosecutor reminded the jury that Aull "lives in this community, he knows at least 6 people that had been shot . . . ." The prosecutor next argued, over defense objection, the disadvantages that Aull would confront if he snitched:

> He likes to go out there and stay on the corner and talk to his friends. His friends hang out with him. He told you that some of his buddies from Barry Farms came down to court with him.

> But the thing about his community is if you snitch, if you talk to the police, if you talk to the Government, if you help the police, if you help the Government, then that makes it very hard to live down Barry Farms because to the extent that your buddies are involved in

some activity that the police want to know about,—

> [DEFENSE COUNSEL]: Objection, no evidence about that.

> THE COURT: Overruled, overruled.

> [PROSECUTOR]: Ladies and gentlemen, we would submit to you that Clarence Aull said during his testimony, during his cross-examination that if a person is snitching, that others who might be involved in the criminal activity are gonna realize that he's bound to snitch on them too.

> So snitching is not only something you need to be concerned about, whether or not you're gonna testify against a friend here in court, but if they're all your friends who might be involved in some criminal activity.

The prosecutor then proceeded, again over defense objection, to ask the jury to infer that Aull was lying when he said he could not identify his own assailants, concluding that "in the context of a community like this, . . . one can understand exactly what's going on":

> So he told you about that community. He also told you that he himself has been shot twice. Once in November of '95 and once in . . . late January '96, once in the hip and once in the shoulder. And surprise, surprise, he's never been able to say who did that. That's the kind of community this is, ladies and gentlemen.

> [DEFENSE COUNSEL]: Objection, Your Honor, there's no evidence again.

> THE COURT: Overruled.

> [PROSECUTOR]: You've been shot in the shoulder. Okay, you get shot in the shoulder, maybe you're not gonna be able to see it. You get shot in the hip, maybe . . . you're not able to see it. But if two different occasions things like this happen and you can't say, you begin to wonder, ladies and gentlemen, in the context of a community like this, we will submit to you that one can understand exactly what's going on.

Clayborne contends that the quoted portions of the prosecutor's rebuttal argument were improper for the same reasons that he challenges the cross-examination of Aull—because the government never proffered evidence to believe either that Aull's friends were murdered for snitching or that Aull lied when he testified that he could not identify his own assailants. Without such evidence, Clayborne in effect argues, the prosecutor "extrapolated too much from too little." *Coreas*, 565 A.2d at 603.

*Analysis*

To evaluate Clayborne's claims we first must determine whether the challenged arguments were improper. If so, and if Clayborne made a timely objection, then we must determine whether the error was harmless under the familiar *Kotteakos* test [12] taking into account such factors as the gravity of the impropriety in context, the centrality of the issue affected by the error, the effect of any corrective action by the trial judge, and the strength of the government's case. If no objection was lodged, our review is limited to plain error. *See McGrier v. United States*, 597 A.2d 36, 41 (D.C.1991). In performing our review, we bear in mind that the trial court has latitude in regulating closing argument, and we do not lightly overturn its discretionary rulings. *See Irick v. United States*, 565 A.2d 26, 32–33 (D.C.1989).

Addressing first the prosecutor's argument concerning Robert White, we do not agree that the challenged comment was improper. The rebuttal argument was responsive to the defense argument that

White was more believable than Williams. *See, e.g., Hall v. United States*, 540 A.2d 442, 447–49 (D.C.1988). The argument that the conflict between White's and Williams' accounts of the shooting could be explained by White's disinclination to say everything he saw was grounded in White's own testimony that he was a reluctant witness.[13] The prosecutor refrained from arguing that White actually did see who shot Burns, something White specifically denied. For these reasons we distinguish the argument here from the arguments we disapproved of in *McClellan v. United States*, 706 A.2d 542, 552–53 (D.C. 1997) (prosecutor "went too far" when he asked jury to infer, "in direct conflict" with witness' testimony, that witness, who was admittedly fearful, really did see killer's face but was afraid of retaliation if she said so), and *Lewis v. United States*, 541 A.2d 145, 146–147 (D.C.1988) (improper for prosecutor to argue that witness said "she didn't want to tell us that she saw" defendant with gun when witness categorically denied ever seeing the gun).

It is true that White did not explain why he was loath to testify, and unlike Aull he did not admit to any generalized bias against being a snitch. Nonetheless, the prosecutor's passing reference to "a community like this, ... Barry Farms" in commenting on White's disinclination to say what he saw was not unduly speculative, especially given not only Aull's testimony about the neighborhood but also testimony that White himself offered about his firsthand exposure to terrible violence.[14] The prosecutor did not suggest,

---

**12.** The test is whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

**13.** When asked on direct examination who was talking to Burns immediately after his shooting, White asked the trial judge "Do I got to give the name up? Do I have to give his first name up?" When he was first asked

by the prosecutor and the police if he understood what Burns had said when he was asked who had shot him, White admittedly "didn't want to tell ..., [and] just kept it all to [him]self."

**14.** In explaining why he ultimately did report what he had heard Burns say, White testified that the shooting reminded him of when he saw his own "little brother" get shot and killed.

even implicitly, that Clayborne was in any way responsible for White's reluctance to testify. Moreover, the prosecutor's reference to Barry Farms was but a momentary allusion that was incidental to his main point. Even if we were to conclude that the comment slightly exceeded what the evidence permitted, we would be hard pressed to attribute any prejudicial effect to it. *See (Rico) Johnson v. United States,* 386 A.2d 710, 713 (D.C.1978) (admission of officer's testimony that incident took place in a "high crime area" not reversible error where "the government's evidence was strong" and the type of neighborhood in which the incident occurred "was not central to the issue of guilt or innocence . . . ."). That defense counsel did not object only reinforces our assessment that the comment was harmless error at worst. *See Parks v. United States,* 451 A.2d 591, 613 (D.C.1982) (citations omitted) ("[a]lthough a failure to object promptly is not dispositive of the issue of prejudice, it constitutes some evidence that appellants did not immediately perceive the challenged argument as prejudicial"). There was certainly no plain error requiring reversal in this case.

■ One piece of the prosecutor's rebuttal argument concerning Aull does give us some pause. For the same reason that we deemed it permissible for the prosecutor to elicit from Aull on cross-examination that several of Aull's friends had been murdered and that Aull himself had been shot, even absent evidence that those incidents were related to snitching, we think it was permissible for the prosecutor to mention those occurrences in argument. Aull's prior experience with such violence was relevant to whether his aversion to snitching explained his failure to implicate Clayborne. The evidence did not, however, justify the prosecutor's further suggestion

that Clayborne was untruthful when he testified that he could not identify his own assailants in either of the two incidents in which he himself was shot.

■ In closing argument the prosecutor (or defense counsel, for that matter) "may not present new evidence or rely on evidence that has not been presented." *Morris v. United States,* 564 A.2d 746, 750 (D.C.1989). Counsel is entitled to make "reasonable comments on the evidence," *Tuckson v. United States,* 364 A.2d 138, 142 (D.C.1976), and to "argue all reasonable inferences from the evidence adduced at trial." *Streater v. United States,* 478 A.2d 1055, 1058–59 (D.C.1984). But counsel "may not go beyond reasonable inference and engage in impermissible speculation." *Gardner v. United States,* 698 A.2d 990, 1001 (D.C.1997).

In this case we agree with Clayborne that the prosecutor "was asking the jury to draw inferences that the evidence simply would not bear," *McClellan,* 706 A.2d at 553, when he suggested that Aull knew who shot him but would not say so. As the prosecutor conceded when he attempted to justify the inference following defense objection, it was entirely possible that Aull did not see who shot him on either occasion. There was no evidence that Aull saw his assailants, that he had an adequate opportunity to observe them if he did see them, that he knew his assailants personally, or that he had some other way of identifying them. Without such evidence, the inference that Aull was lying when he denied being able to identify his assailants was too speculative. *Cf. Lewis,* 541 A.2d at 147 (improper for prosecutor to suggest, without evidence, that witness knew defendant and knew that victim was referring to defendant when victim said "Joe shot me").[15]

---

15. Clayborne argues further that the government improperly insinuated that it was privy to undisclosed evidence that Aull was lying. *Cf. Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (prosecutorial "insinuations, and, especially, assertions of personal knowledge are apt to carry much weight" with juries). We do not agree. To the contrary, after defense counsel objected that "there's no evidence" to support the suggestion that Aull knew who shot him but would not say so, the prosecutor specifically

The insufficiency of the evidence to support the inference that the prosecutor invited the jury to draw does not require reversal, however, because we can say with the requisite "fair assurance" that Clayborne was not substantially prejudiced by the trial court's overruling of his objection. *See Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239. The prosecutor's argument was not wholly indefensible, and even though we may find the reasoning flawed, the point was not belabored and the gravity of the error was not great. For the sake of argument we take at face value Clayborne's contention that the jury's assessment of Aull's credibility was critical to the outcome of the trial, inasmuch as Aull contradicted White's and Williams' testimony that Burns identified Clayborne as the person who shot him. Aull's credibility was tarnished, however, by his own admission that it would be hard for him if his friends thought he was a snitch. Moreover, immediately prior to closing arguments the trial judge instructed the jury that the arguments of counsel did not constitute evidence, that counsel's opinions "don't matter," and that the jury should judge the case only on the evidence. The judge reiterated this admonition following the arguments. Curative instructions are not always effective, *see Powell v. United States*, 455 A.2d 405, 411 (D.C.1982), but in this case we think they were proportionate to the lapse.

We appreciate that when an improper argument is made in rebuttal argument, defense counsel lacks the opportunity to respond. This is a factor we take into account in assessing whether the defense was prejudiced. *See id.* Nonetheless, the rebuttal argument in this case was not calculated to derail or poison the jury's deliberations with facts *dehors* the record, misstatements of the evidence, expressions of opinion, or appeals to passion or prejudice; it merely, in one compara-

tively small respect, was reasoned poorly. As in *McClellan*, 706 A.2d at 553, we think that "[i]t is reasonable to assume that the jury was quite capable of evaluating what was placed before it here," especially since the prosecutor explained how he justified the inference that Aull could identify who shot him. Clayborne argues that the representative of the government is vested with special authority in the eyes of the jury, *see, e.g., Berger*, 295 U.S. at 88, 55 S.Ct. 629, and we do not doubt that this is so. Nonetheless, "jurors do not accept uncritically everything a prosecutor says in argument," *McClellan*, 706 A.2d at 553, and we do not see why they would have been blind to the gaps in the prosecutor's logic in this instance. *Cf. Boyde v. California*, 494 U.S. 370, 385, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). We depend on the trial judge to rein in improper closing argument, including argument that is more speculative conjecture than reasonable inference. *See Gardner*, 698 A.2d at 1001. But it lies within the sound discretion of the judge to stay his hand and leave it to the jury to "detect[ ] prosecutorial non sequiturs." *Mills v. United States*, 599 A.2d 775, 786 (D.C.1991); *accord Allen v. United States*, 603 A.2d 1219, 1227–28 (D.C. 1992).

We find no error in the prosecutor's argument and the trial court's inaction that would justify reversal of Clayborne's conviction.

### Rebuttal Testimony of Katrice Green

Clayborne's final issue on appeal concerns the trial court's decision to allow the government to call the decedent's sister, Katrice Green, in its rebuttal case in order to counter Clayborne's testimony on cross-examination, despite the court's prior determination that Green's testimony had no probative value.

#### Green's Testimony

The government initially proposed to call Katrice Green in its case-in-chief, prof-

---

identified the evidence in the record on which he relied (i.e., Aull's testimony about the

shootings themselves).

fering that her testimony would be relevant to prove Clayborne's consciousness of guilt. In a *voir dire* examination outside the presence of the jury, Green testified that some time after her brother died, she was standing in line at an ice cream truck and became aware that Clayborne was in line behind her. Green then saw Clayborne make "fist gestures at me like he want to hit me or something"—gestures which Green demonstrated and which were described as "making a fist with one hand and putting it into the other open hand." As Clayborne made these gestures, Green heard him say "man, you know, like, like man, he was mad or something." Green testified that she ignored Clayborne, and nothing further happened. The trial court ruled that Clayborne's conduct as described by Green was too ambiguous to have any probative value, and that therefore the government would not be permitted to present Green's testimony in its case-in-chief.

Clayborne thereafter testified in the defense case. On direct examination Clayborne said that he heard rumors after Burns was shot that he was involved in the shooting, but he did not do anything in response because he knew he was innocent and there was nothing for him to do. On cross-examination the prosecutor questioned Clayborne about his failure to take steps to clear his name, and then, over objection, asked him about the incident which Green had earlier described. Clayborne testified that he remembered no such event.

Following this testimony the trial court permitted the government to call Green as a rebuttal witness. Over the objection of defense counsel, the court ruled that Green could testify in rebuttal about Clayborne's behavior at the ice cream truck because Clayborne had testified and put his credibility in issue. Green then testified consistently with her *voir dire* examination. On cross-examination Green admitted that she and Clayborne had once been lovers and were still friends at the time of the ice cream truck incident. She also agreed that Clayborne never threatened her previously.

In his initial summation the prosecutor mentioned Green's testimony only briefly, referring to it as a "little thing" which counted a "little bit" as circumstantial evidence of guilt. The prosecutor did not argue explicitly that Clayborne's behavior at the ice cream truck revealed his consciousness of guilt. Defense counsel argued that Green's rebuttal testimony was meaningless and that the government was "trying too hard ... if they're trying to make that seem like evidence." The prosecutor did not revisit Green's testimony in his rebuttal argument.

On appeal, Clayborne argues that Green's testimony was collateral and not proper rebuttal evidence, and prejudicial because despite its lack of probative value, the jury would inevitably infer from it that Clayborne was trying to intimidate Green because he felt guilty.

*Analysis*

 Evidence that a defendant attempted to intimidate a witness may be admissible because it is probative of consciousness of guilt. *See Proctor v. United States,* 381 A.2d 249, 251 (D.C.1977). In this case, however, we agree with the trial court that Clayborne's conduct at the ice cream truck as described by Green was insolubly ambiguous and not probative of anything. The evidence was therefore irrelevant and the trial court properly precluded the government from introducing it in its case-in-chief.

 Though we find no fault with the trial court's ruling allowing the government to cross-examine Clayborne about the ice cream truck incident, Clayborne's answers did not open the door to Green's testimony about the incident in rebuttal. The incident was collateral to the issues in the case, precisely because, as the trial court previously held, testimony about it was not "admissible independently for any purposes other than the contradiction."

*McClain v. United States,* 460 A.2d 562, 569 (D.C.1983). While a party may cross-examine a witness on a collateral matter, it may not (subject to exceptions not applicable here) introduce extrinsic evidence to rebut the witness' answers. *See id.; see also Patterson v. United States,* 580 A.2d 1319, 1322 (D.C.1990); *Washington v. United States,* 499 A.2d 95, 101 (D.C.1985).

The government argues that Green's testimony was admissible in rebuttal to impeach Clayborne's testimony in his direct examination that he did not "do anything" in response to rumors identifying him as the person who shot Burns. In our view that testimony was too frail a reed to support the rebuttal evidence which the government presented. When a defendant falsely states a specific fact in his direct testimony, the government may be permitted to prove through extrinsic evidence that the defendant lied as to that fact, even if it is collateral. *See Patterson,* 580 A.2d at 1323–24; *(Rudolph) Johnson v. United States,* 373 A.2d 596, 598 (D.C.1977). However, the ambiguous incident that Green described cannot be construed as contradicting anything that Clayborne said in his direct examination.

 Although the trial court erred in permitting the government to call Green as a rebuttal witness to testify about Clayborne's behavior at the ice cream truck, we are satisfied that the error was harmless. In the context of this trial, Green was not a significant witness. Her testimony was brief, and it was weakened by her admissions on cross-examination. The subject matter of Green's testimony was tangential to the central issues in the case and was not inherently inflammatory or otherwise unfairly prejudicial. The significance of Clayborne's conduct as Green described it was utterly obscure and entirely consistent with innocence. Indeed, the prosecutor downplayed Green's testimony in his summation, and defense counsel too gave it short shrift, arguing that the government was grasping transparently at straws.

Clayborne argues that juries are entitled to believe that what they hear is relevant if the court does not instruct otherwise, and that if the jury believed Green, it therefore "must have" treated the ice cream truck incident as some evidence that Clayborne was conscious of his own guilt. We think that this argument, which rests on a premise of juror passivity and incompetence, is fallacious. There is simply no reason to fear that the jury in this case had trouble perceiving the lack of probative value in Green's ambiguous and plainly collateral testimony. Given the focus of the trial and the quantity of evidence directly material to the issue of Clayborne's guilt or innocence, we have difficulty imagining that Green's testimony was of any moment in the jury's deliberations in this case. We can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole," that the error in admitting Green's account into evidence did not substantially influence the jury's determination. *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239; *see also Clark,* 593 A.2d at 192–93; *Giles v. United States,* 432 A.2d 739, 746 (D.C.1981).

*Affirmed.*