*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-FS-632

IN RE C.A., APPELLANT.

06/14/2018

FILED
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(DEL-1027-15)

(Hon. Kimberley S. Knowles, Trial Judge)

(Argued April 5, 2018                                      Decided June 14, 2018)

*Claire Pavlovic*, Public Defender Service, with whom *Samia Fam*, *Jonathan Anderson*, and *Jaclyn Frankfurt*, Public Defender Service, were on the brief for appellant.

*Janice Y. Sheppard*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, and *Rosalyn Calbert Groce*, Deputy Solicitor General, were on the brief for appellee.

Before EASTERLY and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

EASTERLY, *Associate Judge*:  Appellant C.A. appeals from a determination

that he was "involved" in two counts of attempted first degree murder while armed

and related lesser charges.[1]  He argues both that the trial court should not have precluded his impeachment of a key government witness and that it should not have admitted a prior consistent statement by that same witness.  We review the trial court's evidentiary rulings for abuse of discretion, recognizing that it is necessarily such an abuse for the trial court to employ "incorrect legal standards." *Mayhand v. United States*, 127 A.3d 1198, 1205 (D.C. 2015) (internal quotation marks omitted).  We conclude that the trial court's adverse rulings were each an abuse of discretion and were not harmless.   Accordingly, we reverse.

## I.     Facts

The government's case against C.A. turned on the testimony of the two complainants, A.H. and his brother, M.L.  At trial, A.H. and M.L. testified that two males—one dressed in a white t-shirt and jeans (identified as C.A.), the other dressed in all black (identified as C.A.'s adult companion, Mike)—had confronted and followed A.H. and M.L. down the street.  The brothers further testified that Mike handed a gun to C.A. and that C.A. then shot at them.  Counsel for C.A. sought to challenge this narrative and impeach A.H. with the fact that he failed to

---

[1]  D.C. Code §§ 22-2101, -4502, -1803 (2012 Repl.).

correct Officer Wertz—one of the first police officers to respond to the scene and speak to A.H. and his brother—when Officer Wertz told another uniformed officer that "the one in black" (Mike) was the shooter. But the trial court precluded counsel from pursuing this line of impeachment. The trial court subsequently permitted the government to introduce a prior consistent statement by A.H. to a plainclothes detective, identifying C.A. as the shooter. Ultimately, the trial court found that C.A. was the shooter, based on (1) the "adamant" and "consistent" testimony of A.H. and his brother; (2) the shell casings found at the scene; and (3) a surveillance video from a home a block away from the shooting.

## II.    Evidentiary Rulings

### A. Preclusion of Impeachment

C.A. first argues that the trial court erred when it prevented him from impeaching A.H. as to the identity of the shooter with the fact that A.H. failed to correct Officer Wertz when Officer Wertz told another uniformed officer that "the one in black" (Mike) was the shooter. We agree.

On cross-examination, C.A.'s counsel asked A.H. if it was correct that:

> this entire scene was going on around you when all the first officers came there, and they all thought Mike was the shooter, and you never corrected them . . . . There were people going on – or there were cops all around you, talking about Mike being the shooter, or the one all in black being the shooter, and you never spoke up?

Before A.H. could answer, the government objected. The government did not contest the relevance of a witness's prior inconsistent silence; rather, it argued defense counsel had not yet "la[id] a foundation as to whether [A.H.] heard those statements" by the police that the man in black was the shooter. Defense counsel then asked A.H., "[d]id you hear people talking about the one in black being the shooter." A.H. denied that he had. The court called counsel to the bench where defense counsel proffered that bodycam footage showed Officer Wertz telling another uniformed officer that "the one in black" was the shooter, while A.H. sat within earshot and did not correct Officer Wertz. The trial court ruled, however, that defense counsel could not confront A.H. with the bodycam footage and attempt to impeach him with it because the defense could not "prove that he heard" Officer Wertz's statement.

The trial court overstated the requisite foundation for the impeachment of a witness. To impeach A.H., all C.A. had to show was that the line of questioning

was relevant and premised on a good faith basis. Moreover, so long as this line of questioning did not concern a collateral matter, it was permissible for C.A. to confront A.H. with extrinsic evidence (the bodycam video).[2]

"As a general rule, a defendant is entitled to wide latitude in presenting evidence tending to impeach the credibility of a witness . . . ." *Vaughn v. United States*, 93 A.3d 1237, 1264 (D.C. 2014) (brackets and internal quotation marks omitted); 1 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 33 (7th ed. 2016) (explaining "the common law and the Federal Rules [of Evidence] liberally admit impeaching evidence") [hereinafter MCCORMICK ON EVID.]. Relevance is, of course, the baseline prerequisite for any proposed impeachment. On cross-examination "any matter[]" that "contradict[s], modif[ies], or explain[s] the testimony given by a witness during direct examination" will ordinarily be relevant. *Morris v. United States*, 398 A.2d 333, 339 (D.C. 1978); *see also* 1 MCCORMICK ON EVID. § 29 (evidence is relevant on cross-examination if "it aids the trier of fact in appraising the witness's credibility and assessing the probative value of the witness's direct testimony"). If the proposed subject of impeachment

---

[2] The defense only sought to use the video to impeach A.H., not to admit it for its substance. Had the defense sought to do the latter, it would have also had to demonstrate why this out-of-court statement was not hearsay.

is relevant, counsel needs only a "good faith basis" for an impeaching question. *See Clayborne v. United States*, 751 A.2d 956, 963 (D.C. 2000) (explaining that the standard for bias cross-examination is "a good faith basis"[3] and that the requirement is "flexible as well as lenient"); *Garibay v. United States*, 72 A.3d 133, 139 (D.C. 2013) (affirming that a "good faith basis" is all that is needed for counsel to explore on cross-examination "whether [a] witness fabricated an accusation") (internal quotation marks omitted); *see also* ROGER PARK & TOM LININGER, THE NEW WIGMORE, A TREATISE ON EVIDENCE: IMPEACHMENT AND REHABILITATION § 5.12 (1st ed., 2018 Supp.) ("[T]he cross-examiner is required to have a good faith basis for questions about inconsistent statements.") [hereinafter, THE NEW WIGMORE].

Given that A.H. identified C.A. as the shooter on direct examination and testified that C.A. had been wearing a white T-shirt, A.H.'s earlier failure to correct the police's understanding that the person wearing all black was the shooter, when he had the opportunity to do so, was unquestionably relevant to A.H.'s credibility and reliability as a witness. *See Hill v. United States*, 404 A.2d

---

[3] *Clayborne*, 751 A.2d at 963 (alternatively describing the requirement for a good faith basis as "a reasonable factual foundation" and "at least a well-reasoned suspicion") (internal quotation marks omitted).

525, 531 (D.C. 1979) ("Failure to assert a fact, when it would have been natural to assert it, amounts in effect to the assertion of the non-existence of the fact.") (quoting 3A J. WIGMORE, EVIDENCE § 1042 (Chadbourne Rev. 1970)); *cf. Blackson v. United States*, 979 A.2d 1, 7 (D.C. 2009) (explaining that an individual's failure to speak has traditionally been received as an admission so long as a third party makes a statement in the individual's presence and hearing; the individual actually understood what was said; the individual had an opportunity to deny it; and the statement contains assertions which, if untrue, the party would be expected to deny under the circumstances). C.A.'s attorney needed only a good faith basis to believe that A.H. in fact heard Officer Wertz identify the shooter as the man in black and said nothing. C.A.'s counsel had at least that, based on his proffer describing the bodycam footage.[4] Indeed, the government had already conceded the authenticity of the bodycam footage, and defense counsel had, only moments before, used it to successfully impeach A.H. on a different topic (his failure, when asked, to tell the police the nicknames of the shooter and his

---

[4] C.A. has provided this court with a copy of the footage counsel intended to use to impeach C.A. But this footage is not part of the record of this case, *see* D.C. Court of Appeals Rule 10 (a), because counsel was never permitted to play it, and the trial court never looked at it or accepted it as a lodged exhibit for the purposes of an appeal. Although this issue may have been waived because the government did not object to the video's transmission to this court, we do not consider the content of video footage in our analysis.

companion).

Moreover, the trial court's apparent determination that the defense could not challenge the veracity of A.H.'s assertion that he had not heard the conversation between Officer Wertz and the other uniformed officer, and could not confront A.H. with the bodycam footage, was incorrect.  Although parties may not employ extrinsic evidence[5] on cross-examination to impeach witnesses on "collateral matters,"[6] the credibility of A.H. with regard to the identity of the shooter was not collateral.  The identity of the shooter was the central issue at trial.  The credibility of A.H. was, therefore, of "critical importance" because he was a "key government witness [on] whose largely uncorroborated testimony" the government's case rested.  *Coligan v. United States*, 434 A.2d 483, 485 (D.C. 1981) (citing *Davis v. Alaska*, 415 U.S. 308, 317 (1974)).  Defense counsel should have been permitted to confront A.H. with the bodycam footage to attempt to impeach him both on the

---

[5]  In the impeachment context, extrinsic evidence is any evidence that is not produced "through cross-examination of the witness [on the stand]," i.e., testimony of "other witnesses," 1 McCORMICK ON EVID. § 49 n.2 (quoting *United States v. McNeill*, 887 F.2d 448, 453 (3d Cir. 1989), or evidence "as proved through some [other] source" such as an exhibit or a stipulation. 27 VICTOR J. GOLD, WRIGHT & MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE: FEDERAL RULES OF EVIDENCE, § 6096 n.14 (2d ed. 1987, 2018 Supp.).

[6]  1 McCORMICK ON EVID. § 36 n.3; *see also id.* at § 49 (defining collateral matters as those which are not "relevant to a fact of consequence on the. . . merits of the case").

original point that he had failed to correct Officer Wertz and on the fact that he had not been truthful when he denied having heard Officer Wertz.[7] *See Clayborne*, 751 A.2d at 963; THE NEW WIGMORE § 5.12.

## B.    Admission of Prior Consistent Statement

C.A. also argues that the trial court erred in admitting a statement A.H. made to a plainclothes officer, Detective Roy, in which he identified C.A. as the shooter; the trial court ruled over defense objection that the government could elicit evidence of this prior consistent statement in its rebuttal case.  Prior statements consistent with a witness's trial testimony are generally not admissible because they are not legitimately probative:  "mere repetition does not imply veracity and once an inconsistency in [a] statement is shown, evidence of additional consistent statements does not remove the inconsistenc[y]." *Mason v. United States*, 53 A.3d 1084, 1090 (D.C. 2012) (internal quotation marks and ellipsis omitted); *accord Worthy v. United States*, 100 A.3d 1095, 1097 (D.C. 2014).  There are exceptions to this rule, but they are "narrowly defined." *Musgrove v. United States*, 441 A.2d

---

[7] As noted above, see note 4, the court never viewed the bodycam footage and, without doing so, it could neither credit A.H.'s denial that he heard Officer Wertz in light of counsel's proffer to the contrary, nor determine that counsel lacked a good faith basis for impeaching A.H. with his prior inconsistent silence.

980, 985 (D.C. 1982).

Per statute, prior consistent statements are admissible "to rebut an express or implied charge against the witness of recent fabrication or improper influences or motive" when the statement predates any of these grounds for impeachment. D.C. Code § 14-102 (b)(2) (2012 Repl.); *Ventura v. United States*, 927 A.2d 1090, 1103 (D.C. 2007). Prior consistent statements are also admissible for the limited purpose of allowing the factfinder to consider an inconsistent statement when it is part of the same statement used to impeach the witness, under a rule of completeness rationale. *Musgrove*, 441 A.2d at 985. Recently this court determined that, in addition to these two well-established exceptions, a prior consistent statement may be admitted "for rehabilitation purposes" so long as "the proposed evidence is directed only at the particular impeachment that occurred" and could be of "very clear help to the factfinder in determining whether the witness is truthful." *Worthy*, 100 A.3d at 1097–98 (internal quotation marks omitted). But, in discussing the precedent that supported the recognition of this third exception, the court in *Worthy* made clear that it "does not open the door to admissibility, willy-nilly, of prior consistent statements simply because a prior inconsistent statement has been used for impeachment." *Id.* at 1098 n.5.

On appeal, the government argues that the trial court permissibly employed this third exception under *Worthy* to admit A.H.'s statement to Detective Roy at the scene in which he identified C.A. as the shooter. We disagree. Preliminarily, we note that the trial court made its initial ruling without reference to *Worthy*, which no one at that point had cited. Instead, the court appeared to base its ruling on one of the two other exceptions.

The court first indicated that it thought that A.H.'s prior consistent statement could come in under D.C. Code § 14-102 (b)(2) to rebut a charge of recent fabrication raised by defense counsel's "questions about[] 'you didn't tell anyone on the scene about these things.'" Even if this had been defense counsel's line of questioning, this exception would not have authorized the admission of A.H.'s statement to Detective Roy. The consistent statement that was offered did not predate the motive; rather, it came after the inconsistent statement. *See Mason*, 53 A.3d at 1092; *cf. Tome v. United States*, 513 U.S. 150, 156 (1995) (interpreting Rule 801 (d)(1)(B) under the federal rules to require the prior consistent statement to predate the motive to fabricate to be admissible). Beyond timing, the consistent statement offered did not rebut C.A.'s impeachment of A.H., which was much more targeted. As defense counsel reminded the trial court, he had sought to impeach A.H. specifically with A.H.'s failure to identify C.A. as the shooter to the

uniformed officers who were first on the scene. Counsel explained that the defense theory was that, at this juncture, A.H. and his brother were "making what isn't exactly an excited utterance, but what amounts to an excited utterance," and giving the uniformed first responders their best and least calculated recollection of the incident.[8] As counsel explained, whether A.H. had later spoken to a detective at the scene did not meet the force of this impeachment.

The trial court stated that A.H.'s statement to the detective was alternatively admissible because "it puts it all in context." There is no such justification for the admission of prior consistent statements under our law. To the extent the trial court was alluding to the limited exception that permits admission of the consistent parts of an inconsistent statement under a rule of completeness rationale (the exception the government pressed at trial but does not discuss on appeal), the court's ruling also lacked foundation. A.H.'s later statement to a plainclothes detective that C.A. was the shooter could not reasonably be characterized as part of the whole of his earlier statement to the uniformed officers. Officer Wertz testified

---

[8] *See Mayhand*, 127 A.3d at 1206 ("The essential rationale of [the excited utterance] hearsay exception is that statements made while a person is overcome by excitement or in shock are fundamentally trustworthy. The theory at least is that the wash of excitement blocks the reflection and calculation that could produce false statements. . . .").

that he and another uniformed officer spoke to A.H. and his brother for about ten minutes, after which there was a gap of several minutes before the detectives arrived at the scene. There was no rule of completeness rationale that justified the admission of this distinct, later-in-time statement. *Cf. Cox v. United States*, 898 A.2d 376, 381 (D.C. 2006).

This leaves only our decision in *Worthy*—which had not previously been cited by the government and instead was first cited by the defense in support of its motion to reconsider—as a potential foundation for the trial court's ruling admitting A.H.'s prior consistent statement. In ruling on C.A.'s motion to reconsider, the trial court identified *Worthy* as authority for the general proposition that there are "other ways a prior consistent statement can come in." But the court did not explain why A.H.'s statement to Detective Roy was admissible under *Worthy*. Even assuming that the exception recognized in *Worthy* was the implied basis for the trial court's decision both to issue and then stand by its ruling, we conclude that the admission of A.H.'s statement to Detective Roy did not fall within the "limited conditions for admissibility" authorized thereunder. *Worthy*, 100 A.3d at 1098.

In *Worthy*, this court upheld the admission of a prior statement made by the

complainant on the day of the assault in which she told a detective that the defendant had hit her and threatened to kill her. *Id.* at 1096. Although consistent with her trial and grand jury testimony, it directly met the impeachment by the defense that the day after the incident, she told the police that the defendant "did not do anything to her," because the consistent statement was closer in time to the incident. *Id.* at 1096, 1098.

C.A's case is distinguishable. A.H. spoke to Detective Roy later in time, *after* he spoke to the uniformed officers, and his statement that C.A. was the shooter was not "directed only at the particular impeachment that occurred,"[9] *Worthy*, 100 A.3d at 1098 (internal quotation marks omitted), because it did not explain why A.H. had not told the uniformed officers, the first responders, who the shooter was. More generally, nothing in *Worthy* suggests that it was altering the long-standing "general rule of exclusion," *id.*, for prior consistent statements that

---

[9] One might question whether any "particular impeachment . . . occurred" so as to justify rehabilitation. *Worthy*, 100 A.3d at 1098 (internal quotation marks omitted). As discussed above, C.A. was precluded from using the bodycam footage to impeach A.H. with his prior inconsistent silence, and the defense's attempt to impeach A.H. through Officer Wertz (who acknowledged that A.H. had never told him that C.A. or the person in the white t-shirt was the shooter, but also testified that he never asked A.H. who the shooter was) was arguably unsuccessful. *See Musgrove,* 441 A.2d at 985 ("Prior consistent statements . . . may not be used to support a witness'[s] unimpeached testimony."). This argument, however, has not been raised on appeal.

dictates they are admissible only in "exceptional circumstances." *Musgrove*, 441 A.2d at 985. No such exceptional circumstances were present in this case.

Because A.H.'s statement to Detective Roy identifying C.A. as the shooter did not fit into any of the exceptions to the ban on prior consistent statements, the trial court should not have admitted it into evidence.

### III. Harm

In assessing harm, we examine the trial court's two erroneous evidentiary rulings together. *Smith v. United States*, 26 A.3d 248, 264 (D.C. 2011) ("The standard for reversal where more than one error is asserted on appeal is whether the cumulative impact of the errors substantially influenced the . . . verdict.") (internal quotation marks omitted). Applying the standard for nonconstitutional error set forth by the Supreme Court in *Kotteakos v. United States*, we conclude that we cannot say, "with fair assurance" that the trial court's verdict was not "substantially swayed" by the cumulative impact of these errors. 328 U.S. 750, 764–65 (1946).[10]

---

[10] C.A. argues that the trial court's ruling precluding his impeachment of A.H. rises to the level of a constitutional violation that should be analyzed under the harmlessness beyond a reasonable doubt test set forth in *Chapman v.*

(continued…)

There was no real dispute at trial that A.H. and his brother had been shot at; the only question was by whom. In issuing its verdict the trial court explained that its determination that C.A. was the shooter had a three-part foundation: (1) the "adamant" and "consistent" testimony of A.H. and his brother that C.A. was the shooter; (2) the shell casings found at the scene; and (3) a surveillance video taken by a camera a block away from the shooting. The latter two pieces of evidence, however, shed no light on the identity of the shooter.

The shell casings only corroborated the complainants' account that they had been shot at and, because of their caliber, provided some link between the shooting and the gun the police recovered from C.A.'s companion Mike when the police arrested him. (C.A. was not present.) The surveillance video does not establish C.A.'s identity as the shooter. Because of the level of pixilation, no facial features are discernible for the figure in the video the government identified as the shooter; nor is any gun visible.[11] As the shell casings and the video footage did not

_____

(…continued)
*California*, 386 U.S. 18 (1967). Because we conclude that the evidentiary errors require reversal under the *Kotteakos* standard, we do not reach this issue.

[11] A few seconds before gunshots are heard, the video shows a flash of light—what the government asserted was a muzzle flash—adjacent to a person in a

(continued…)

establish the shooter's identity, the only possible foundation for the trial court's determination that C.A. was the shooter was the credited testimony of the complainants, A.H. and his brother, the only eyewitnesses to the shooting who testified for the government at trial.

On this record, we cannot say that precluding A.H.'s impeachment and erroneously admitting evidence to rehabilitate A.H. was harmless. Although A.H. was impeached on other points, the precluded impeachment and improper rehabilitation on the central question of the timeliness of his identification may have altered the trial court's assessment of his credibility. Specifically, it could have affected the court's evaluation of the "adaman[ce]" and "consisten[cy]" within A.H.'s own narrative and as compared with the trial testimony of his brother, M.L., who was also impeached on a variety of grounds. *See, e.g.*, *Smith*, 26 A.3d at 264–66 (concluding that a combination of evidentiary errors by the trial court, including erroneous preclusion of impeachment evidence, was not harmless); *Moss v. United States*, 368 A.2d 1131, 1135 (D.C. 1977) (determining

---

(…continued)
white t-shirt. This does not support a conclusion that C.A. was the shooter. Although A.H. and M.L. testified that C.A. was wearing a white t-shirt during the incident, the government acknowledges that "[w]ithin hours of the shooting" C.A., was stopped "wearing a black shirt."

that reversal was required where the defense was precluded from cross-examining a key government witness with a prior inconsistent statement); *Tibbs v. United States*, 359 A.2d 13, 16 (D.C. 1976) (concluding that the introduction of prior consistent statements was not harmless where that witness's testimony was essential to the government's case).   We therefore reverse the trial court's judgment.

*So ordered.*